# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-01153-PAB-KLM

MELISSA YOUNG, individually and on behalf
of others similarly situated,

  Plaintiff,

v.

FRONTIER AIRLINES, INC.,

  Defendant.

---

## UNOPPOSED AMENDED MOTION TO CONSOLIDATE

---

  Defendant Frontier Airlines, Inc., ("Frontier") submits its Unopposed Amended Motion to Consolidate pursuant to Fed R. Civ. P. 42 and D.C.COLO.LCivR 42.1, and in support, states:

  On July 16, 2020, Frontier filed its Unopposed Motion to Consolidate. Dkt No. 20. In its Unopposed Motion to Consolidate, Frontier sought the consolidation of this case (the "*Young* Case") and three other recently-filed cases that Frontier is defending in the United States District Court for the District of Colorado: *Sweet v. Frontier Airlines, Inc.* Case No. 1:20-cv-01340-RM-NRN (the "*Sweet* Case"), *Rivera-De Leon v. Frontier Airlines, Inc.*, Case No. 1:20-cv-01518-NRN (the "*Rivera-De Leon* Case"), and *Obertman v. Frontier Airlines, Inc.* Case No. 1:20-cv-01689-STV (the "*Obertman* Case"). Plaintiffs in all four cases seek to represent overlapping nationwide classes of persons who claim to be entitled to refunds for Frontier flights canceled as a result of the COVID-19 pandemic.

On June 18, 2020, Frontier accepted service of another case involving an overlapping nationwide classes of persons who claim to be entitled to refunds for Frontier flights canceled as a result of the COVID-19 pandemic: *Johnson v. Frontier Airlines, Inc.* Case No. 1:20-cv-01751-MEH (the "*Johnson* Case"), also pending in the United States District Court for the District of Colorado. In a June 22, 2020 email, counsel for Plaintiff in the *Johnson* Case agreed that consolidation of the *Johnson* Case is also appropriate.

Accordingly, Frontier files this Unopposed Amended Motion to Consolidate to seek to consolidate the *Young* Case with four other cases, the *Sweet* Case, the *Rivera-De Leon* Case, the *Obertman* Case, and the *Johnson* Case. The *Young* Case and these four other cases involve a threshold common question, warranting consolidation under D.C.COLO.LCivR 42.1 and F.R.C.P. 42.[1] Counsel for Plaintiffs in all five of these cases consent to consolidation before this Court.

## LEGAL STANDARD

Fed. R. Civ. P. 42(a)(2) provides that "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions . . . ." D.C.COLO.LCivR 42.1 provides:

> A motion to consolidate shall be filed in the lowest numbered case included in the proposed consolidation and shall be decided by the district judge to whom the lowest numbered case is assigned. A notice of filing of a motion to consolidate shall be filed by the movant as a party or, with the assistance of the clerk, as an interested party in all other cases proposed for consolidation. A motion to consolidate shall

---

[1] While this threshold common question/allegation warrants consolidation, multiple reasons that Frontier will present to this Court at the appropriate time demonstrate that each of these cases cannot be maintained as putative class actions, and that certification of any class in these cases is unsupported.

be given priority. Consolidated cases shall be reassigned to the judicial officer(s) to
whom the lowest numbered consolidated case was assigned.

The decision to consolidate actions involving a common factual or legal issue is submitted to the
broad discretion of the trial court, which should consider judicial economy and fairness to the
parties. *Crocs, Inc. v. Effervescent, Inc.*, Civil Action No. 06-cv-00605-PAB-KMT, 2017 U.S.
Dist. LEXIS 215185, *4 (D. Colo. Jan. 27, 2017). Because this case is the "lowest numbered case
in the proposed consolidation," this Amended Motion to Consolidate is filed before this Court and
is to be decided "by the district judge to whom the lowest numbered case is assigned."
D.C.COLO.LCivR 42.1. Upon approval of this Amended Motion to Consolidate, the
"[c]onsolidated cases shall be reassigned to the judicial officer(s) to whom the lowest numbered
consolidated case was assigned." *Id.*

## ARGUMENT

These cases should be consolidated in consideration of judicial economy and fairness to
the parties because they are overlapping nationwide putative class actions with a nearly identical
threshold common issue of fact or law. Here, in the "lowest numbered case," the putative class is
pleaded in the Complaint as:

> All persons in the United States who purchased tickets for travel on a Frontier flight
> scheduled to operate to, from, or within the United States whose flights were
> cancelled or were subject to a significant schedule change and not refunded.

*Young* Case Compl. ¶ 22.

The complaints for the *Sweet* Case, the *Rivera-De Leon* Case, the *Obertman* Case and
the *Johnson* Case are attached as **Exhibit 1**, **Exhibit 2**, **Exhibit 3**, and **Exhibit 4**, respectively.
In the *Sweet* Case, the putative class is pleaded in the complaint as:

> All persons residing in the United States or its territories who purchased tickets for

travel on a Frontier Airlines flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by Frontier Airlines, and who were not provided a refund.

**Exhibit 1**, *Sweet* Case Compl. ¶ 60. In the *Rivera-De Leon* Case, the putative class is pleaded

in the complaint as:

All persons in the United States who purchased airline tickets through Frontier Airlines, or for flights on Frontier Airlines, to, from or within the United States, and sought to cancel their flights, or had their flights cancelled, on or after February 29, 2020.

**Exhibit 2**, *Rivera-De Leon* Case Compl. ¶ 83. In the *Obertman* Case, the putative class is

pleaded in the complaint as:

All persons in the United States who purchased tickets for travel on a Frontier Airlines flight scheduled to operate from March 1, 2020 through the date of the a class certification order, whose flight(s) were canceled by Frontier, and who were not provided a refund.

**Exhibit 3,** *Obertman* Compl. ¶ 37. Originally filed in the Eastern District of California, the

*Obertman* Case was transferred by stipulation to the District of Colorado on June 10, 2020. In the

*Johnson* Case, the putative class is defined as:

All persons or entities in the United States who purchased at least one ticket for a Frontier flight that was cancelled between January 1, 2020, and the present and who did not receive a refund.

**Exhibit 4**, *Johnson* Case Compl. ¶ 40.

Consolidation of these cases is important to avoid inconsistent rulings and wasting

resources by simultaneously litigating the same threshold question in different courts. "The interest

of judicial economy is unquestionably served by consolidation in this instance because it will

eliminate the need for various judicial officers to address and rule on substantially the same issue

in [five] different cases." *Skaggs v. Level 3 Communs., Inc.*, Civil Action No. 09-cv-00200-PAB-

CBS, 2009 U.S. Dist. LEXIS 14226, *4 (D. Colo. Feb. 24, 2009). "Similarly, defendants stand to benefit from responding to filings in only one case rather than [five]." *Id.* There will be no prejudice to the plaintiffs in the overlapping putative class actions. Like its original motion, this Amended Motion to Consolidate is unopposed.

WHEREFORE, for the reasons above, Frontier respectfully requests consolidation of all five cases: the *Young* Case, the *Sweet* Case, the *Rivera-De Leon* Case, the *Obertman* Case and the *Johnson* Case, and for any other relief the Court deems just and proper.

DATED this 23rd day of June, 2020.

Respectfully submitted,

By: */s/ Jason D. Melichar*
Jason D. Melichar, Esq.
R. Joseph Isert, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
1225 17th Street, Suite 2750
Denver, CO 80202
Telephone: (303) 572-5300
Facsimile: (303) 572-5301
jason.melichar@wilsonelser.com
joe.isert@wilsonelser.com

William J. Katt, Esq.
740 N. Plankinton Avenue, Suite 600
Milwaukee, WI 53203
(414) 276-8816
(414) 276-8819 (fax)
william.katt@wilsonelser.com

Patrick J. Kearns, Esq.
401 West A Street Suite 1900
San Diego, CA 92101
(619) 321-6200
(619) 321-6201 (fax)
patrick.kearns@wilsonelser.com

David M. Ross, Esq.
1500 K Street, NW, Suite 330
Washington, D.C. 20005
(202) 626-7660
(202) 628-3606 (fax)
david.ross@wilsonelser.com

*Attorneys for Defendant Frontier Airlines, Inc.*

## CERTIFICATION PURSUANT TO D.C.COLO.LCivR 7.1(a)

Frontier's counsel certifies that on June 22, 2020, counsel for Plaintiff in the *Johnson* Case provided consent for inclusion of that case into the cases listed in Frontier's Unopposed Motion to Consolidate. Frontier's counsel further certifies that in connection with Frontier's June 16, 2020 filing of the Unopposed Motion to Consolidate, on June 12, 15, and 16, 2020, counsel for Frontier conferred with Plaintiffs' counsel in the cases listed therein for which consolidation is sought regarding the relief sought in the Motion to Consolidate, and Frontier's counsel is authorized to state that Plaintiffs do not oppose the relief requested therein. Undersigned counsel understands that counsel for the Plaintiffs in the *Sweet* Case have filed or intend to file in dozens motions to transfer venue in other cases involving different airlines and do not oppose consolidation provided that it does not prejudice their rights with respect to those motions.

*/s/ Jason D. Melichar*
Jason D. Melichar, Esq.

## <u>CERTIFICATE OF COMPLIANCE WITH D.C.COLO.LCivR 42.1</u>

I hereby certify that I am today filing a notice of filing of the foregoing Unopposed Amended Motion to Consolidate in the *Sweet* Case, the *Rivera-De Leon* Case, the *Obertman* Case, and the *Johnson* Case, pursuant to D.C.COLO.LCivR 42.1.

*/s/ Jason D. Melichar*
Jason D. Melichar, Esq.

1101811v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2020, a true and correct copy of the foregoing was filed with ECF and served to all counsel of record:

Scott A. Kamber, Esq.
Michael J. Aschenbrener, Esq.
Kamber Law, LLC
201 Milwaukee Street, Suite 200
Denver, CO 80206
Telephone: (646) 964-9600
Facsimile: (212) 202-6364
skamber@kamberlaw.com
masch@kamberlaw.com

Max S. Roberts, Esq.
Bursor & Fisher, P.A. – New York
888 17th Avenue, 3rd Floor
New York, NY 10019
mroberts@bursor.com

Yeremey O. Krivoshey
Bursor & Fisher, P.A.
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ykrivoshey@bursor.com

*Attorneys for Plaintiff in Young Case*

As to the service of today's filing of the notice of the filing of the foregoing amended motion to consolidate, which included a copy of the foregoing:

Hassan A. Zavareei, Esq.
Annick Marie Persinger, Esq.
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

1101811v.1

Jeff Ostrow, Esq.
Jonathan M. Streisfeld, Esq.
Joshua R. Levine, Esq.
Daniel Tropin, Esq.
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: streisfeld@kolawyers.com
Ostrow@kolawyers.com

Melissa S. Weiner, Esq.
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com

Daniel L. Warshaw, Esq.
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*Attorneys for Plaintiff in Obertman Case*

Kathryn J. Stimson
Jamie Hubbard
STIMSON STANCIL LABRANCHE HUBBARD, LLC
1652 Downing Street
Denver, CO 80218
Phone: 720.689.8909
Email: stimson@sslhlaw.com
hubbard@sslhlaw.com

Daniel O. Herrera*
Christopher P.T. Tourek*
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP

150 S. Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: 312-782-4880
Facsimile: 318-782-4485
dherrera@caffertyclobes.com
ctourek@caffertyclobes.com

Bryan L. Clobes*
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP
205 N. Monroe St.
Media, Pennsylvania 19063
Telephone: 215-864-2800
bclobes@caffertyclobes.com

Joseph G. Sauder*
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
jgs@sstriallawyers.com

*Attorneys for Plaintiffs in Rivera De-Leon Case*

Tina Wolfson
AHDOOT & WOLFSON, P.C.
Bradley K. King
Theodore Maya
10728 Lindbrook Drive
Los Angeles, CA 90024
(310) 474-9111
(310) 474-8585 (Fax)
twolfson@andootwolfson.com
bking@andootwolfson.com
tmaya@andootwolfson.com

LIDDLE & DUBIN, P.C.
David R. Dubin
Nicholas A. Coulson
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
ddubin@ldclassaction.com

ncoulson@ldclassaction.corn

*Attorneys for Plaintiffs in Sweet Case*

Shanon J. Carson
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-4656
Email: scarson@bm.net

John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470
Email: jalbanese@bm.net

Adam E. Polk
Jordan Elias
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
Email: apolk@girardsharp.com
Email: jelias@girardsharp.com

*Attorneys for Plaintiff in Johnson* Case

*/s/ Jason D. Melichar*
Jason D. Melichar, Esq.

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-1340


JAMIE SWEET, and STEPHANIE FAUST,

on behalf of themselves and all others similarly situated,

     Plaintiff,

v.

FRONTIER AIRLINES, a Colorado Corporation,

     Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

### INTRODUCTION

1.    Plaintiffs ("Plaintiffs"), by and through their counsel, file this Class Action Complaint against Frontier Airlines, Inc. ("Defendant" or "Frontier") on behalf of themselves and on behalf of a class of similarly situated individuals, and allege, upon personal knowledge as to their own actions, and upon investigation of counsel as to all other matters, as follows:

### NATURE OF THE ACTION

2.    In the midst of the greatest public health and economic crisis in living memory, Defendant, one of the nation's largest air carriers, has sought to shift its losses onto its innocent passengers,

furthering the financial hardship endured by people across the country.

3.      Each of Defendant's airfare tickets encompasses a contractual agreement between it and its passengers. That agreement gives passengers the right to a refund if their flight is cancelled.

4.      With mounting cancellations due to the COVID-19 pandemic, Defendant has sought to refrain from paying out the refunds for cancelled flights to which its passengers are entitled.

5.      Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals who were deprived of refunds for cancelled flights.

6.      Defendant has quietly sought to force its passengers to endure the financial losses that its own contract created for it in the entirely foreseeable scenario that world occurrences would disrupt the domestic travel industry.

7.      Defendant's uniform conduct is equally applicable to the class.  Plaintiffs bring this class action against Defendant for breach of contract and seeks an order requiring Defendant to, among other things: (1) refrain from issuing coupons in lieu of refunds to any Class member who has not requested coupons; and (2) pay damages and/or restitution to Plaintiffs and Class members.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendant.

9.      This Court has personal jurisdiction over Defendant because it conducts significant, substantial, and not-isolated business activities in Colorado, is headquartered and incorporated in

Case 1:20-cv-01340-PAB-KLM Document 1 Filed 05/12/20 USDC Colorado Page 4 of 16
of 125
Case 1:20-cv-01340   Document 1   Filed 05/12/20   USDC Colorado   Page 3 of 14

Colorado, and a substantial portion of the acts complained of took place in Colorado.

10.     Venue is proper in the District of Colorado because Defendant conducts business in this

District and many of the events that gave rise to Plaintiffs' claims occurred in this District.

## I.     PARTIES

11.     Plaintiff Jamie Sweet is an individual and a citizen of Missouri.

12.     Plaintiff Stephanie Faust is an individual and a citizen of North Carolina.

13.     Defendant Frontier Airlines, Inc. is a corporation organized under the laws of Colorado

with its principal place of business located in Colorado.

## II.     FACTUAL ALLEGATIONS

14.     Frontier is a major north American airline company that carried approximately 22 million

passengers in 2019.

15.     Defendant is based in Denver and its flight network includes regular routes to more than

100 destinations throughout the United States, as well as in the Caribbean, Mexico, and South

America.

16.     Defendant offers and sells flight tickets directly to customers, who make monetary

payments to Defendant in exchange for a selected flight itinerary that conforms to customer's

specifically selected travel schedule. Defendant also sells flight tickets through third-party

websites and travel agents.

17.     Defendant collects passenger identification information as part of each ticket sale,

including name, address, and telephone information, and each ticket purchased guarantees

customers a seat on a specific, scheduled flight departing at a specific time from a specific airport.

Case 1:20-cv-01340   Document 1   Filed 05/12/20   USDC Colorado   Page 4 of 14

18.     As part of each ticket purchase, Defendant makes a promise and warranty to customers that in the event of a flight cancellation or substantially interrupted flight, customers are entitled to a full cash refund.

19.     Defendant update its Contract of Carriage on April 16, 2020.

20.     Defendant's Contract of Carriage in place from October 25, 2019 until April 16, 2020 provided that where a flight was cancelled and replacement transportation not provided, a customer was entitled to   "a refund for the unused portion of the passenger's ticket in lieu of the transportation[.]"

21.     The October 25, 2019 Contract of Carriage further dictated that "[a]ll refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and the country in which the refund is being made."

22.     The Contract of Carriage calls for all refunds to be made to the original payment method.

23.     The Contract of Carriage only allows for the issuance of travel vouchers in the event of involuntary boarding denials for oversold flights, not cancellations.

24.     The relevant foregoing terms to not differ between Defendant's October 25, 2019 and April 16, 2020 Contracts of Carriage.

25.     Defendant's contract of carriage does not promise, permit, or require the issuance of any vouchers or coupons in lieu of monetary refunds in the event of cancellation.

26.     Under U.S. law, 49 U.S.C.  §41712 prohibits unfair or deceptive practices in the air carrier industry and "since at least the time of an Industry Letter of July 15, 1996 … the [DOT's] Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes to cancel is a violation" of that section.  Enhancing Airline

Case 1:20-cv-01340-PAB-KLM Document 21-1 Filed 06/30/20 USDC Colorado Page 6 of 15
of 125
Case 1:20-cv-01340   Document 1   Filed 05/12/20   USDC Colorado   Page 5 of 14

Passenger Protections, 76 Fed. Reg. 23110-01, 23129.

27.     As part of each ticket purchase, Defendant made a promise and warranty to customers that in the event of a flight cancellation or substantially interrupted flight, customers are entitled to a full monetary refund.

*Defendant's Response to the Covid-19 Pandemic*

28.     On January 30, 2020, the World Health Organization declared the Covid-19 virus a public health emergency of international concern.

29.     As of late-February, Covid-19 confirmed cases in the United States were detected and exponentially increasing, including cases that were not caused by recent international travel but through community spread.

30.     On March 11, 2020, the WHO officially declared Covid-19 a global pandemic.

31.     Throughout March, daily cases of Covid-19 were increasing dramatically as well, in addition to many of the countries where Defendant offers air travel services.

32.     As part of each ticket purchase, Defendant made a promise and warranty to customers that in the event of a flight cancellation or substantially interrupted flight, customers are entitled to a full cash refund.

33.     Across the United States, state and local governments began issuing shelter-in-place orders that specifically prohibited non-essential travel, specifically including air travel because of the extraordinary risk that air travel presented to the ability to strictly adhere to social distancing standards and avoid inter-community and inter-state travel—both of which threatened to dramatically increase the spread of the virus.

Case 1:20-cv-01340-PAB-KLM Document 21-1 Filed 06/23/23 USDC Colorado Page 6 of 15
of 125
Case 1:20-cv-01340   Document 1   Filed 05/12/20   USDC Colorado   Page 6 of 14

34.     The U.S. Federal Government issued social distancing guidelines that further warned of the substantial risks of human-to-human and community spread of the virus, and air travel was clearly discouraged.

35.     It was entirely known and foreseeable to Defendant that many of its previously scheduled flights need to be cancelled in order to protect the public from a catastrophic infection spread and loss of life and respond to the dramatically decreased demand for air travel.

36.     Yet, Defendant quietly ceased honoring contractual agreements with customers, including Plaintiffs and the putative class, by discontinuing full monetary refunds for cancelled and substantially rescheduled flights and instead providing expiring credits.

37.     The practice of offering expiring credits is particularly wrongful and inadequate during the Covid-19 epidemic because it remains entirely unclear when normal air travel will once again be safe.

38.     The future flight credits provide Defendant additional opportunities to charge service, processing, baggage, and other fees that will ensure Defendant additional future profits—while retaining Plaintiffs' cash in the interim—substantially diminishing any value for Plaintiffs and the putative class.

39.     Recognizing the abuse, and potential for abuse, by Defendant and other airline companies, the United States Department of Transportation ("DOT") was forced to step in to remind Defendant that they remain under an obligation to provide passengers with their rights to a refund for a cancelled flight resulting from the Covid-19 pandemic.

40.     On April 3, 2020, the DOT issued a notice to remind carriers "that passengers should be refunded promptly when their scheduled flights are cancelled or significantly delayed." It notes

Case 1:20-cv-01340 Document 1 Filed 05/12/20 USDC Colorado Page 7 of 14
of 125
Case 1:20-cv-01340 Document 1 Filed 05/12/20 USDC Colorado Page 7 of 14

that "[a]lthough the COVID-19 public health emergency has had an unprecedented impact on air

travel, the airlines' obligation to refund passengers for cancelled or significantly delayed flights

remains unchanged." [1]

41.    The notice continues that:

> [t]he Department is receiving an increasing number of complaints and inquiries
> from ticketed passengers, including many with non-refundable tickets, who
> describe having been denied refunds for flights that were cancelled or significantly
> delayed. In many of these cases, the passengers stated that the carrier informed
> them that they would receive vouchers or credits for future travel. But many
> airlines are dramatically reducing their travel schedules in the wake of the COVID-
> 19 public health emergency. As a result, passengers are left with cancelled or
> significantly delayed flights and vouchers and credits for future travel that are not
> readily usable.
>
> Carriers have a longstanding obligation to provide a prompt refund to a ticketed
> passenger when the carrier cancels the passenger's flight or makes a significant
> change in the flight schedule and the passenger chooses not to accept the
> alternative offered by the carrier. The longstanding obligation of carriers to
> provide refunds for flights that carriers cancel or significantly delay does not cease
> when the flight disruptions are outside of the carrier's control (e.g., a result of
> government restrictions). The focus is not on whether the flight disruptions are
> within or outside the carrier's control, but rather on the fact that the cancellation
> is through no fault of the passenger. Accordingly, the Department continues to
> view any contract of carriage provision or airline policy that purports to deny
> refunds to passengers when the carrier cancels a flight, makes a significant
> schedule change, or significantly delays a flight to be a violation of the carriers'
> obligation that could subject the carrier to an enforcement action.
> …
> Specifically, the Aviation Enforcement Office will refrain from pursuing an
> enforcement action against a carrier that provided passengers vouchers for future
> travel in lieu of refunds for cancelled or significantly delayed flights during the
> COVID-19 public health emergency so long as: (1) the carrier contacts, in a timely
> manner, the passengers provided vouchers for flights that the carrier cancelled or
> significantly delayed to notify those passengers that they have the option of a
> refund; (2) the carrier updates its refund policies and contract of carriage
> provisions to make clear that it provides refunds to passengers if the carrier cancels
> a flight or makes a significant schedule change; and (3) the carrier reviews with
> its personnel, including reservationists, ticket counter agents, refund personnel,
> and other customer service professionals, the circumstances under which refunds
> should be made.

[1] https://www.transportation.gov/sites/dot.gov/files/2020-
04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf (last accessed April 15,
2020), footnotes omitted.

Case 1:20-cv-01340 Document 1 Filed 05/12/20 USDC Colorado Page 8 of 14
of 125
Case 1:20-cv-01340   Document 1   Filed 05/12/20   USDC Colorado   Page 8 of 14

42.     In addition to violating its own contract of carriage, Defendant has failed to conform to the April 3, 2020 DOT Notice and 49 U.S.C. §41712 and provide full refunds to its passengers.

43.     Defendant has deprived Plaintiffs and the Class of the refunds to which they are entitled by 1) failing to provide refunds to their credit or debit cards; 2) issuing coupons or vouchers in place of refunds; 3) rendering it functionally impossible to specifically request refunds over vouchers/coupons by inaccessibility of customer service, with wait times of more than two hours frequently reported; and/or 4) obscuring passengers' right to a monetary refund.

*Plaintiffs' Use of Defendant's Services*

44.     Plaintiff Sweet purchased a round trip ticket from St. Louis, Missouri to Las Vegas Nevada, scheduled to depart on March 22, 2020 (flight F92095) and return on March 29, 2020 (flight F92094).

45.     Plaintiff Sweet paid $845.35 for her ticket, including baggage fees.

46.     On or about March 15, 2020, the State of Nevada issued an emergency directive which resulted in the closure of all hotels and casinos.

47.     Upon hearing of the directive and the resulting functional impossibility of her travel, Plaintiff Sweet cancelled her flights with Defendant, but Defendant ultimately cancelled both flights.

48.     Plaintiff Sweet was told by Defendant's agents to fill out an online form requesting a refund and wait ten days.

49.     After fifteen days of hearing nothing, she called back and was told that she would not be issued a refund, and she was offered a credit instead- which had to be used within 90 days during the midst of a worldwide pandemic.

50.     Plaintiff Sweet has attempted all reasonable means to address this dispute. She has contacted Defendant's corporate offices, who simply passed her off to a call center. She has also filed a complaint with the Better Business Bureau.

51.     Plaintiff Sweet does not want a worthless expiring credit. She wants the refund to which she is legally entitled.

52.     Plaintiff Stephanie Faust purchased three tickets from Defendant for travel from Charlotte, North Carolina to Billings, Montana.

53.     Plaintiff Faust's tickets were originally for travel on or about May 26, 2020.

54.     On March 19, 2020, Defendant e-mailed Plaintiff Faust and notified her that her flight had been cancelled, and that she could choose to cancel or reschedule.

55.     Plaintiff Faust elected to reschedule her flight for May 29.

56.     On March 31, 2020, Defendant sent Plaintiff Faust an e-mail noting that her new flight had been cancelled and informing her that she could select a voucher for the value of her ticket plus $50 or could request a refund.

57.     Plaintiff Faust selected the refund option. Defendant's staff directed her through a website portal where she made the request, and she was told she would have her refund within 7 days.

58.     After 7 days, Plaintiff Faust received no refund, and called Defendant to inquire. She was told that the refund may take 10 business days.

59.     Days later after she still had not received her refund, Plaintiff Fault called Defendant to again inquire. Defendant's customer service agent laughed at her, literally, and told her that she would not receive a refund, only a credit which would expire in June of 2020.

## III.   CLASS ALLEGATIONS

60.     Plaintiffs bring this class action under Rule 23 and seek certification of the claims and

issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined

as:

> All persons residing in the United States or its territories who purchased tickets for
> travel on a Frontier Airlines flight scheduled to operate from March 1, 2020
> through the date of a class certification order, whose flight(s) were canceled by
> Frontier Airlines, and who were not provided a refund. Excluded from the Class are
> (a) any person who has specifically requested a coupon or voucher in lieu of a
> refund; (b) any person who requested and received alternative air transportation in
> lieu of a refund; (c) all persons who are employees, directors, officers, and agents of
> either Defendant; (d) governmental entities; and (e) the Court, the Court's immediate
> family, and Court staff.

61.     Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity

or division into subclasses after having had an opportunity to conduct discovery.

62.     **Numerosity.**  Fed. R. Civ. P. 23(a)(1).  Defendant carries approximately 20 million

passengers per year on many thousands of flights. A significant percentage of those flights during

the class period have been cancelled. At a minimum, there are tens of thousands of Class Members

but very likely many more. The exact size of the proposed class and the identity of all class

members can be readily ascertained from Defendant's records.

63.     **Commonality.**  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact

common to the class, which questions predominate over any questions affecting only individual

class members.  Common issues include:

> A.     Whether Defendant formed contracts with its passengers in selling them tickets for
> air travel;
>
> B.     Whether Defendant's conduct breaches the terms of its contracts with its
> passengers, including its Contract of Carriage and Terms of Service;

> C. Whether Defendant is required to provide a refund, rather than an expiring voucher, to passengers for cancelled flights.
>
> D. The nature of the relief, including equitable relief, to which Plaintiffs and the class are entitled.

64. **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the Class they seek to represent. Plaintiffs and all Class members were exposed to substantially similar contracts, breaches, and sustained injuries arising out of and caused by Defendant's unlawful conduct.

65. **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Further, Plaintiffs' counsel is competent and experienced in litigating class actions.

66. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiffs and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendant's misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

67. Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to

individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

68. Class certification is also appropriate under Rule 23(b)(2), as Defendant has acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

<u>**FIRST CAUSE OF ACTION**</u>

**Breach of Contract**

69. Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

70. A contract was formed between Plaintiffs and Class members on the one hand and Defendant on the other with respect to the purchase of airfare.

71. The contract was offered by Defendant and formed at the time Plaintiffs and the Class accepted it by purchasing their tickets.

72. The contract that governs the transactions at issue in this case requires refunds for cancelled flights where the passenger does not elect to take substitute transportation.

73. Plaintiffs and the Class performed their obligations under the contract.

74. Defendant breached the contract when they sought to provide coupons or vouchers in lieu of refunds for passengers on canceled flights.

75. Defendant's breaches were willful and not the result of mistake or inadvertence.

76. As a result of Defendant's breach, Plaintiffs and other Class members have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class of similarly situated individuals, requests the Court to:

(a)     Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representatives of the class and designate counsel of record as class counsel;

(b)     Order Defendant to provide actual damages and equitable monetary relief (including restitution) to Plaintiffs and class members and/or order Defendant to disgorge profits they realized as a result of their unlawful conduct;

(c)     Order Defendant to pay punitive damages, as allowable by law, to Plaintiffs and class members;

(d)     Declare Defendant's conduct unlawful and enter an order enjoining Defendant from continuing to engage in the conduct alleged herein;

(e)     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(f)     For costs of the proceedings herein;

(g)     For reasonable attorneys' fees as allowed by law; and

(h)     Award such other relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

//
//

Dated: May 12, 2020

Respectfully submitted,

*s/Tina Wolfson*
Tina Wolfson
**AHDOOT & WOLFSON, P.C.**
Bradley K. King (PHV Forthcoming)
Theodore Maya (PHV Forthcoming)
10728 Lindbrook Drive
Los Angeles, CA 90024
(310) 474-9111
(310) 474-8585 (Fax)
twolfson@ahdootwolfson.com
bking@ahdootwolfson.com
tmaya@ahdootwolfson.com

**LIDDLE & DUBIN, P.C.**
David R. Dubin (PHV Forthcoming)
Nicholas A. Coulson (PHV Forthcoming)
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
ddubin@ldclassaction.com
ncoulson@ldclassaction.com

*Attorneys for Plaintiffs and the Putative Class*

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Case No.

NELCY ALEXA RIVERA-DE LEON, PIOTR TCHORZEWSKI,
and STEPHANIE MUTERS, individually and on behalf of all
others similarly situated,

      Plaintiffs,

v.

FRONTIER AIRLINES, INC.,

      Defendants.

---

## CLASS ACTION COMPLAINT

---

Plaintiffs Nelcy Alexa Rivera-De Leon, Piotr Tchorzewski, and Stephanie Muters
(collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this
action against Defendant Frontier Airlines, Inc. (collectively, "Defendant" or "Frontier"), by and
through their attorneys, and allege as follows based on information and belief, except as to
allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge:

### INTRODUCTION

1.      America is at war with an invisible enemy. In late December 2019, a previously
undiscovered coronavirus surreptitiously spread from animals to humans in a wet market in
Wuhan, the capital of China's Hubei province, and began its march across continents, rivers and
oceans, infecting countless people along the way.

2.      Unlike prior coronaviruses, such as the virus that caused Middle East Respiratory
Syndrome, this virus and the disease it causes—dubbed COVID-19—spreads insidiously. Due to
its potentially extensive incubation period and ability to transmit itself via asymptomatic hosts,
COVID-19 has wreaked unprecedented havoc across the globe. Indeed, although the virus was not

detected in the United States until mid-January 2020, it has now infected more than one million people across the country.

3.      In an effort to slow the virus's spread and avoid overwhelming medical systems, beginning in late February state and local governments across the country began issuing "stay-at-home" orders that allowed residents to leave their homes only for necessities such as medical care and food.

4.       Unsurprisingly, airline travel has come to a near standstill as Americans find themselves unable to leave their homes, let alone travel domestically or internationally. Over the past few months Frontier and its competitors have had no choice but to cut schedules and cancel thousands of flights accordingly.

5.      Unfortunately for Plaintiffs and the putative Class (defined below), Frontier has shifted the burden of this extraordinary crisis onto its customers, who, in some cases, paid thousands of dollars for flights the COVID-19 pandemic precluded them from taking.

6.      Unlike its competitors, Frontier has engaged in a scheme to evade its obligation to refund to its customers monies paid for flights they will never take, but which they may sorely need in order to provide for themselves and their families during this trying time.

7.      Frontier is aware that federal law and its own Conditions of Carriage—which Frontier incorporates by reference into every ticket it sells—require Frontier to issue customers refunds for flights canceled due to COVID-19.

8.      As the pandemic grew, however, Frontier began to email passengers ticketed on flights Frontier intended to cancel and encourage them to preemptively cancel their flights in exchange for bonus credits of $50 per ticket or Frontier points. Frontier also failed to disclose that

if those passengers simply waited for Frontier to cancel their flights, Frontier was legally obligated to provide them with a full monetary refund.

9.      To make matters worse, Frontier requires consumers to apply the credits Frontier issued in lieu of refunds within 90 days, despite knowing full well Plaintiffs and the Class likely cannot do so because domestic air travel has come to a standstill and most passengers are unable to make future travel plans due to COVID-19.

10.     Through its misstatements and omissions, Frontier sought to deceive its loyal customers into allowing Frontier to avoid its refund obligations while providing only illusory credits likely to expire before Plaintiffs and the Class can use them.

11.     Frontier has engaged in unfair, unlawful, and unconscionable practices in order to unjustly enrich itself at the expense of its customers. Accordingly, Plaintiffs bring this action in order to secure refunds for each and every similarly situated consumer Frontier has wronged by refusing to issue full refunds for flights cancelled as a direct and proximate result of the COVID-19 crisis.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Frontier because it is headquartered in this judicial district.

14. Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District, transacts business in this District, is subject to personal jurisdiction in this District, and therefore is a citizen of this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

**Plaintiffs**

**Nelcy Alexa Rivera-De Leon**

15. Plaintiff Nelcy Alexa Rivera-De Leon is a resident of Florida.

16. On December 16, 2019, Plaintiff Rivera-De Leon purchased four tickets to fly round-trip on Frontier between Tampa, Florida and San Juan, Puerto Rico on March 13, 2020 and March 20, 2020, respectively.

17. Plaintiff Rivera-De Leon paid approximately $483.00 for her Frontier tickets for a family vacation, which was to include her husband, Roger Zehr, and two minor children.

18. Plaintiff Rivera-De Leon's husband, Roger Zehr, is active-duty military.

19. On or about March 12, 2020, Roger Zehr was advised that, effective March 13, 2020, he was prohibited from non-military travel for 60 days.[1]

20. When Plaintiff Rivera-De Leon learned that her husband would be unable to travel, she immediately cancelled her trip through Frontier's website.

21. Upon cancelling her Frontier trip, Plaintiff Rivera-De Leon was advised by Frontier that she would only receive a credit toward a future trip rather than a refund of the purchase price, and that she had until June 11, 2020 to use those credits.

---

[1] *See,* "Travel Restrictions for DoD Components in Response to Coronavirus Disease 2019 (March 11, 2020) (available at: https://media.defense.gov/2020/Mar/11/2002263242/-1/-1/1/TRAVEL-RESTRICTIONS-FOR-DOD-COMPONENTS-IN-RESPONSE-TO-CORONAVIRUS-DISEASE-2019.PDF) (last visited May 19, 2020).

22.     Frontier ultimately cancelled Plaintiff Rivera-De Leon's return flight from San Juan, Puerto Rico to Tampa, Florida.

23.     Plaintiff Rivera-De Leon cannot apply her flight credits by June 11, 2020 because of ongoing restrictions imposed by COVID-19 that make it impossible for her to make future plans.

24.     Plaintiff Rivera-De Leon has called Frontier and attempted to contact it through Facebook Messenger on several occasion in hopes of securing a refund, but Frontier has ignored her phone calls and refused her requests for a full monetary refund.

25.     As of the filing of this Complaint, Frontier has not refunded Plaintiff Rivera-De Leon the price of her tickets.

**Piotr Tchorzewski**

26.     Plaintiff Piotr Tchorzewski is a resident of New Jersey.

27.     On December 20, 2019 Plaintiff Tchorzewski paid $1,245.63 for three tickets for himself and his family to fly round-trip on Frontier between Newark, New Jersey and Cancun, Mexico on April 10, 2020 and April 17, 2020, respectively. Plaintiff Tchorzewski also paid an additional $98 to select specific seats.

28.     On or about March 21, 2020, the Governor of New Jersey issued Executive Order No. 107, requiring New Jersey residents to stay at home.[2]

29.     On or about March 21, 2020, Plaintiff Tchorzewski received an email from Frontier recommending that he cancel his flights in exchange for a "bonus" $50 voucher per passenger on a new booking.

30.     On or about March 23, 2020, Plaintiff Tchorzewski clicked on the "more information" button on one of the emails Frontier sent to entice him to prematurely cancel his

---

[2] https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf (last visited May 19, 2020).

flights, so as to learn more about his rights with respect to his Frontier tickets and the COVID-19 pandemic.

31.     When Plaintiff Tchorzewski clicked on the "more information" button, however, Frontier automatically cancelled his flight reservations in exchange for Frontier credit.

32.     Upon purportedly cancelling his Frontier trip, Frontier advised Plaintiff Tchorzewski that he would only receive a credit toward a future trip and the bonus credits he was promised rather than a refund of his purchase price, and that the credits he received in connection with his original purchase will expire on June 21, 2020.

33.     Significantly, Frontier refused to provide a refund or voucher for the seat reservations Plaintiff Tchorzewski purchased for $98.

34.     Plaintiff Tchorzewski then tried to re-book the flight Frontier had tricked him into purportedly cancelling, only to be told by Frontier that he could not because his previously scheduled flight had been cancelled by Frontier.

35.     Plaintiff Tchorzewski cannot apply his flight credits by June 21, 2020 because of ongoing restrictions imposed by COVID-19.

36.     Plaintiff Tchorzewski has called Frontier on several occasions in order to secure a refund, but Frontier has either ignored her phone calls or refused her request for a full monetary refund.

37.     As of the filing of this complaint, Frontier has not refunded Plaintiff Tchorzewski the price of his tickets.

**Stephanie Muters**

38.     Plaintiff Stephanie Muters is a resident of New York.

39.     On or about February 24, 2020, Plaintiff Muters purchased two airline tickets for herself and her daughter to fly round-trip on Frontier between Syracuse, New York and Tampa, Florida on April 5, 2020 and April 13, 2020, respectively.

40.     Plaintiff Muters paid approximately $849.60 for her Frontier tickets.

41.     Plaintiff Muters is employed as a civilian by the U.S. Department of Defense.

42.     Plaintiff Muters' daughter is health-compromised and uniquely susceptible to COVID-19.

43.     On or about March 12, 2020, Plaintiff Muters was advised that, effective March 13, 2020, she was prohibited from non-military travel for 60 days.[3]

44.     On or about March 17, 2020, Plaintiff Muters received an email from Frontier recommending that she cancel her flights in exchange for a "bonus" $50 voucher per passenger on a new booking.

45.     On or about March 22, 2020, the Governor of New York issued a stay-at-home order to New York residents that was extended through May 28, 2020.[4]

46.     On or about March 23, 2020, the Governor of Florida issued an Order requiring people flying to Florida from New York or New Jersey to undergo a 14-day quarantine.[5]

47.     Plaintiff Muters had planned to travel to Florida from New York, and her entire trip was scheduled for fewer than 14 days.

48.     On or about March 19, 2020, Plaintiff Muters cancelled her trip on Frontier because she had been ordered to refrain from travel by her employer, the U.S. Department of Defense; she had been enticed to do so by Frontier; she was ordered by her Governor to stay at home; and she

---

[3] *See* n. 1, *supra*.
[4] https://coronavirus.health.ny.gov/new-york-state-pause (last visited May 19, 2020).
[5] *See* n. 3, *supra*.

was ordered by the Governor of Florida to endure a 14-day quarantine if she did travel upon arrival in Florida.

49.     Upon cancelling her Frontier trip, Plaintiff Muters was advised by Frontier that she would only receive a credit toward a future trip rather than a refund of the purchase price, and that she has until June 17, 2020 to apply the credits she received for cancelling her flight.

50.     Frontier ultimately cancelled the flights on which Plaintiff Muters was scheduled to travel.

51.     Plaintiff Muters cannot apply her flight credits by June 17, 2020, because of both ongoing restrictions imposed by COVID-19 and the fact that she is uncertain when her health-compromised daughter will be able to travel again.

52.     Plaintiff Muters has called Frontier and attempted to contact it through Facebook Messenger on several occasions in hopes of securing a refund, but Frontier has either ignored her phone calls or refused her request for a full monetary refund.

53.     As of the filing of this complaint, Frontier has not refunded Plaintiff Muters the price of her tickets.

**Defendant**

54.     Defendant Frontier Airlines, Inc. is a corporation organized under the laws of the State of Colorado with a principal place of business at 4545 Airport Way, Denver, Colorado 80239.

55.     Defendant Frontier conducts substantial business throughout the United States, including in the States of Florida, New Jersey, and New York.

## FACTUAL ALLEGATIONS

### A. Frontier's Contract of Carriage

56.     According to Frontier, its "Contract of Carriage" applies "to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier") as well as that transportation regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used[.]"[6]

57.     Under the Frontier Contract of Carriage Section 18, Subsection B, Frontier contracts with customers that, "[i]n the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability *except to provide a refund for the unused portion of the ticket*."[7]

58.     Under these terms, if Frontier cancels a flight, it is contractually obligated to provide each affected ticketholder a refund for the full fare inclusive of taxes and fees.

### B. The COVID-19 Pandemic

59.     On March 11, 2020, the World Health Organization reclassified COVID-19 as a worldwide pandemic.  That same night, President Trump made a televised address from the Oval Office during which he announced a moratorium on all flights from Europe (excluding Great Britain) for 30 days. The President extended that ban to Great Britain the very next day.

60.     The President declared a "National Emergency" on March 13, 2020 and, on March 15, 2020, the Centers for Disease Control and Prevention recommended that U.S. residents avoid

---

[6] Frontier Contract of Carriage § 1,
file://nvavsxencif01.mst.net/cbwhome$/ctourek/Downloads/cs_coc_41620.pdf (last accessed May 14, 2020)
[7] Frontier Contract of Carriage § 18.B,
file://nvavsxencif01.mst.net/cbwhome$/ctourek/Downloads/cs_coc_41620.pdf (last accessed May 14, 2020) (emphasis added).

gatherings of 50 people or more. The next day, the federal government tightened those guidelines and recommended avoiding groups of 10 people or more.

61.    Despite these efforts, by March 23, 2020 the United States had reported more confirmed cases of COVID-19 than any other county in the world, and by the end of March the governors of most states had declared states of emergency due to COVID-19. State and local officials across the country also issued stay-at-home orders that cancelled public events, banned group gatherings, and closed schools, restaurants, and retail stores and prohibited unnecessary travel for weeks, if not indefinitely.

### C. The Airline Industry's Response to the COVID-19 Pandemic

62.    As a direct and proximate result of this unprecedented crisis, in March 2020, many airlines, including Frontier, cancelled or rescheduled flights.

63.    These cancellations continued into April 2020, when Frontier announced it would be "cutting more than 90% of flight capacity nationwide in April" and expected to only "be in a position to gradually build flight capacity back up to as much as 35% in May."[8]

64.    Frontier has since issued a statement saying that it will not achieve full flight capacity until July 2020.[9]

65.    While most airlines throughout the world have provided refunds for flights canceled due to COVID-19, some, including Frontier, have refused to issue refunds to customers.

---

[8] https://www.cleveland.com/business/2020/04/frontier-airlines-cuts-90-of-capacity-flying-only-to-orlando-from-cleveland-hopkins-in-april.html
[9] https://centreforaviation.com/analysis/reports/covid-19-frontier-airlines-has-a-more-bullish-view-than-most-524183

**D. The United States Department of Transportation's April 3, 2020 Enforcement Notice**

66.     On April 3, 2020, in response to airlines' refusals to issue refunds to passengers for cancelled flights, the United States Department of Transportation issued an Enforcement Notice Regarding Refunds By Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency On Air Travel" (the "Enforcement Notice").[10] The Enforcement Notice states that:

> Carries have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's scheduled flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions).

67.     Moreover, the requirement to provide a "prompt refund" applies to passengers who purchased "non-refundable tickets" and applies to any optional fee charged for services a passenger is unable to use, such as baggage fees, meals, and seat upgrades.

68.     The Enforcement Notice also states that this obligation "does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions)." Instead, airlines are required to offer refunds whenever passengers are not at fault for the cancellation, regardless of whether the cancellation is within or outside the carrier's control.

69.     The "longstanding obligation" regarding refunds is set forth in the Code of Federal Regulation. Specifically, consumers are entitled to refunds whenever their carrier cancels their flight. 76 Fed. Reg. 23110-01, at 23129 (Apr. 25, 2011) ("Since at least the time of an Industry Letter of July 15, 1996 . . . the Department's Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes

---

[10] Available at: https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf (last visited Apr. 6, 2020).

to cancel is a violation of 49 U.S.C. 41712 (unfair or deceptive practices) and would subject a carrier to enforcement action.").

**E. Frontier's Continued Failure to Provide Customers Refunds**

70.    Despite the plain language of its own Contract of Carriage and the guidance issued by the U.S. Department of Transportation, Frontier has engaged in a pattern and practice of denying refunds to its passengers for flights cancelled as a result of the COVID-19 pandemic.

71.    Frontier's scheme to deny refunds to its customers relies on making its refund mechanisms difficult to access. Instead of providing the refunds required by the Contract of Carriage and the Enforcement Notice, Frontier attempts to convince customers to pre-emptively cancel their flights for Frontier credit or points—failing to inform customers that they are, in fact, entitled to a full monetary refund if they simply wait for Frontier to cancel their flights.

72.    And, as Plaintiffs' experiences demonstrate, Frontier has typically cancelled the very flights it urged Plaintiffs and Class members to cancel in exchange for credits.

73.    In other words, Frontier sought to trick Plaintiffs and the Class into preemptively cancelling their flights in order to relieve Frontier of its obligation to issue full monetary refunds for flights it ultimately cancelled.

74.    Indeed, the COVID-19 pandemic and its accompanying uncertainty play an integral role in Frontier's scheme. In the form email Frontier repeatedly sent its customers urging them to prematurely cancel their reservation in response to a "limited time offer," an exemplar of which is included below, Frontier acknowledges that "things are difficult during this unprecedented time," before encouraging customers to cancel their flights:



## ACT NOW, OFFER ENDS TONIGHT

**00** DAYS | **00** HOURS | **00** MINUTES | **00** SECONDS

**ACT NOW TO QUALIFY!**

### IMPORTANT INFORMATION ABOUT YOUR UPCOMING FLIGHT

### FINAL DAY – CANCEL AND RECEIVE A $50 VOUCHER PER PASSENGER ON YOUR BOOKING

Valued Customer,

We want to thank you for choosing Frontier. We know things are difficult during this unprecedented time and we want to provide you another option for your upcoming travel with us.

Cancel your booking today and you will receive a **$50 per person voucher for future travel**. This is in addition to a travel credit applicable to a future Frontier flight for the full amount of your unused ticket.

## STEP 1

Simply go to **flyfrontier.com** now and cancel your flight via the "**My Trips/Checkin**" tab.

## STEP 2

You will automatically receive your credit for future use and **also** receive your additional voucher within seven days of your cancellation to the email address used in the original booking. Your **$50 per person**

**voucher** will be available for booking through Dec. 31, 2020. The best part is your travel does not need to be completed by Dec. 31 just booked!

To qualify for the $50 per person voucher and flight credit, you must cancel your flight **TONIGHT** (Friday, March 27). This offer is valid for flights scheduled from **March 28 – June 17**. If you did not book your travel with Frontier directly, you will need to update your contact information when you cancel your flight. For more about this offer, **click here**.

We appreciate your continued patience and understanding as we navigate this challenging time, and we hope to serve you on many future Frontier flights.

Team Frontier

75.    After deceiving customers like Plaintiffs to opt for Frontier credit or points instead of the refund to which they are entitled, Frontier uses the Frontier credit selection as basis on which to deny refunds for flights it later cancelled.

76.    Moreover, whenever a customer chooses to pre-emptively cancel their flight, Frontier does not refund them —in Frontier credit or otherwise—any of the additional fees they incurred when purchasing their original airline tickets, such as fees paid for seat selection.

77.    The Frontier credits provide Frontier additional opportunities to charge service, processing baggage, seat selection, and other fees that will ensure Frontier additional future profits—while retaining Plaintiff and Class members' cash—substantially diminishing any value for Plaintiff and the Class members.

78.    Moreover, Frontier requires customers to apply the credits in as few as ninety (90) days, or risk that the credit will expire. This durational limit is unduly narrow, particularly in the throes of the COVID-19 pandemic, which has rendered future airline travel uncertain.

14

79.     When customers pre-emptively cancel their flights—often at Frontier's urging—they subsequently receive a confirmation email that outlines how much in Frontier credit they will receive and a single line in the middle of the email informing customers that "[t]his Customer Credit will expire 90 days from [that date on which the customer cancelled their flight]."

80.     This time limit to use the credits renders them worthless during the COVID-19 pandemic while air travel is at a virtual standstill and will likely remain that way for quite some time.

81.     Indeed, any future travel plans Plaintiffs or Class members might make are in flux due to the uncertainty and quarantine-restrictions caused by the COVID-19 pandemic.

82.     Despite the significant backlash to Frontier's cancelation and refund policy, Frontier continues to refuse to provide cash refunds to passengers for flights cancelled due to COVID-19.

## CLASS ALLEGATIONS

83.     Plaintiffs bring this action, individually and, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), on behalf of a Nationwide Class defined as follows:

> All persons in the United States who purchased airline tickets through Frontier Airlines, or for flights on Frontier Airlines, to, from or within the States, and sought to cancel their flights, or had their flights cancelled, on or after February 29, 2020.

84.     In the alternative, Plaintiffs bring this class action on behalf of the following State Classes:

> **The Florida Class**:
>
> All persons in Florida who purchased airline tickets through Frontier Airlines, or for flights on Frontier Airlines, to, from or within the United States, and sought to cancel their flights, or had their flights cancelled, on or after February 29, 2020.

15

**The New Jersey Class**:

All persons in New Jersey who purchased airline tickets through Frontier Airlines, or for flights on Frontier Airlines, to, from or within the United States, and sought to cancel their flights, or had their flights cancelled, on or after February 29, 2020.

**The New York Class**:

All persons in New York who purchased airline tickets through Frontier Airlines, or for flights on Frontier Airlines, to, from or within the United States, and sought to cancel their flights, or had their flights cancelled, on or after February 29, 2020.

85.     Together, the National Class, the Florida Class, New Jersey Class, and New York Class shall be collectively referred to herein as the "Class."

86.     Excluded from the Class are: (a) Frontier; (b) Frontier's affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.

87.     **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information is in the sole possession of Frontier and obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis allege, that the Class consists of hundreds of thousands of people.

88.     **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.     Whether federal regulations require Frontier to provide passengers a refund when Frontier cancels their flights;

b.     Whether Frontier committed common law fraud;

c.     Whether Frontier was unjustly enriched by its conduct; and

16

        d.      Whether Frontier violated its Contract of Carriage.

89.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out Frontier's uniform conduct, statements, and unlawful, unfair, and deceptive acts and practices.

90.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

91.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Frontier's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

92.    Frontier has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
## CONVERSION
**(on behalf of the Nationwide Class, or alternatively the Florida, New Jersey and/or New York Classes)**

93.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

94.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Frontier.

95.     Plaintiffs and Class members have an ownership right to the monies paid for the tickets for cancelled flights sold by Frontier, as well as for the consequential damages resulting therefrom.

96.     Frontier has wrongly asserted dominion over the payments illegally diverted to them for the cancelled flights, and consequential damages resulting therefrom. Frontier has done so every time Plaintiffs and Class members paid to purchase a ticket for a flight that was later cancelled or subject to a significant schedule change by Frontier.

97.     As a direct and proximate cause of Frontier's conversion, Plaintiffs and Class members suffered damages in the amount of the payments made for each time they purchased a ticket for a flight that was cancelled or subject to a significant schedule change by Frontier, and in the amount of consequential damages resulting therefrom.

## COUNT II
## COMMON LAW FRAUD
**(on behalf of the Nationwide Class, or alternatively the Florida, New Jersey and/or New York Classes)**

98.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

18

99.     Frontier made material misrepresentations and/or omissions concerning the ability of Plaintiffs and Class members to receive refunds for cancelled flights. For example, Frontier falsely represented that Plaintiffs and the Class members were only entitled to travel credits rather than refunds. As a result, Plaintiffs and the other Class members were fraudulently induced to accept travel credits in exchange for their unusable tickets and not provided with refunds.

100.     Frontier had a duty to disclose to Plaintiffs and the Class members that they were entitled to refunds but failed to do so.

101.     These misrepresentations and omissions were made by Frontier with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely upon them.

102.     Plaintiffs and Class members reasonably relied on these omissions, and suffered damages as a result.

**COUNT III**
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class, or alternatively the Florida, New Jersey and/or New York Classes)**

103.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

104.     Plaintiffs and the Class conferred a direct benefit on Frontier by purchasing airline tickets.

105.     Frontier knowingly and willingly accepted and enjoyed the benefits conferred on it by Plaintiff and the Class.

106.     Frontier's retention of these benefits in unjust and inequitable due to the conduct described herein.

107.     As a direct and proximate cause of Frontier's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## COUNT IV
## BREACH OF CONTRACT
**(on behalf of the Nationwide Class, or alternatively the Florida, New Jersey and/or New York Classes)**

108.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

109.    Plaintiffs bring this claim on behalf of himself and members of the Class.

110.    This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Frontier's breaches of its Contract of Carriage.

111.    Frontier entered into Contracts of Carriage with Plaintiffs and Class members to provide services in the form of flights in exchange for customer payment of fares and other fees.

112.    Frontier drafted these Contracts of Carriage.

113.    Plaintiffs and all putative class members performed under the Contract of Carriage. Specifically, Plaintiffs and Class members tendered payment for airline tickets to Frontier and complied with all conditions precedent under the Contract of Carriage.

114.    Due to Frontier's cancellation of its flights, Plaintiffs and Class members cannot use their airline tickets through no fault of their own and are not receiving the benefit of their bargain with Frontier.

115.    Under the terms of the Contract of Carriage drafted by Frontier, Plaintiffs and Class members are entitled to refunds because Frontier cancelled their flights and did not accommodate and transport the customers to their destinations on another flight. Contract of Carriage § 18(a)(1).

116.    By failing to provide refunds, Frontier has breached its Contract of Carriage.

117.    As a result of Frontier's breaches of contract, Plaintiffs and Class members have incurred substantial damages.

## COUNT V
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
## Fla. Stat. § 501.201, *et seq.*
## (By Plaintiff Rivera-De Leon on behalf of the Florida Class)

118.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

119.    The purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202 (2).

120.    The actions of Frontier, as set forth above, occurred in the conduct of trade or commerce.

121.    In the course of Frontier's business, it intentionally and knowingly misrepresented material facts regarding refund options available to Plaintiff Rivera-De Leon and Florida Class members with the intent to mislead the Florida Class, as described above. Indeed, Frontier deceptively persuaded Florida Class members to pre-emptively cancel their flights and accept expiring "Frontier credit," rather than a full monetary refund. Accordingly, Frontier engaged in unfair and deceptive acts or practices.

122.    Frontier should have disclosed this information because it was in a superior position to know the true facts related to its plans to cancel or delay future Frontier flights, as well as its obligation under both the Contract of Carriage and the Enforcement Notice to provide full monetary refunds, and Plaintiff Rivera-De Leon and the Florida Class could not reasonably be expected to learn or discover the true facts related to these internal Frontier plans. Frontier, by the conduct and omissions described above, also knowingly and intentionally concealed from Plaintiff

Rivera-De Leon and the Florida Class that Frontier planned to cancel or seriously delay future Frontier flights, thereby entitling Florida Class members to full monetary refunds for the tickets they purchased.

123. Frontier knowingly misrepresented the rights of Florida Class members, as well as its own obligations, in an attempt to avoid providing Florida Class members any refunds, and instead reimburse Plaintiff and the Florida Class with illusory Frontier credits.

124. These acts and practices have deceived Plaintiff Rivera-De Leon and the Florida Class and are likely to, and did, deceive the public. In failing to disclose Frontier's future flight plans and its refund obligations, and suppressing material facts from Plaintiff Rivera-De Leon and the Florida Class, Frontier breached its duties to disclose these facts, violated the FDUTPA, and caused injuries to Plaintiff Rivera-De Leon and the Florida Class.

125. The omissions and acts of concealment by Frontier pertained to information that was material to Plaintiff Rivera-De Leon and the Florida Class, as it would have been to all reasonable consumers. Had Plaintiff Rivera-De Leon and the Florida Class known that Frontier was planning to cancel and/or seriously delay most future flights, and that doing so would entitle customers to full refunds, they would either not have pre-emptively canceled their flights for expiring "Frontier credit."

126. The injuries suffered by Plaintiff Rivera-De Leon and the Florida Class are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Rivera-De Leon and the Florida Class should have reasonably avoided.

127. Frontier's conduct proximately caused injuries to Plaintiff and the Florida Class.

128. Plaintiff Rivera-De Leon and the Florida Class are entitled to recover legal and/or equitable relief including an order enjoining Frontier's unlawful conduct, actual damages in the

amount of full monetary refunds, costs and reasonable attorneys' fees pursuant to F. STAT. § 501.2105, and any other just and appropriate relief.

## COUNT VI
### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
#### (N.J. Stat. Ann. § 56:8-1, e*t. seq.*)
#### (By Plaintiff Tchorzewski on behalf of the New Jersey Class)

129. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

130. Plaintiff Tchorzewski, the New Jersey Class, and Frontier are or were "person[s]" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

131. Frontier engaged in the "sale" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

132. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. STAT. ANN. § 56:8-2. Frontier engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

133. In the course of its business, Frontier willfully failed to disclose and actively concealed Frontier's plan to cancel their flights and its refund obligations to the New Jersey Class,

and instead attempted to convince customers to pre-emptively cancel the airline tickets they purchased from Frontier in exchange for "Frontier credit"—credit which expired within 90 days.

134. Frontier also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and cancellations of Frontier flights. Frontier is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the New Jersey CFA.

135. Frontier knew or should have known that its conduct violated the New Jersey CFA.

136. As alleged above, Frontier made false or misleading material statements about Frontier's flight plans in an attempt to convince Plaintiff Tchorzewski and New Jersey Class members to preemptively cancel their flights in order to relieve Frontier of its obligation to issue refunds for flights it ultimately cancelled.

137. Frontier also employed deceptive emails that automatically cancelled a customer's Frontier airline reservation when the customer sought to gain more information.

138. Frontier knew that Plaintiff Tchorzewski and New Jersey Class members were entitled to a full monetary refund, but withheld that information from Class members.

139. Frontier owed Plaintiff Tchorzewski and New Jersey Class a duty to disclose its plans to cancel future Frontier flights, as well as Frontier's duty to provide full refunds to Class members, due to the COVID-19 pandemic because it:

    a. Possessed exclusive knowledge about Frontier's future flight plans;

    b. Intentionally concealed the Frontier's future flight plans and its refund obligations; and/or

c. Made incomplete representations about New Jersey's Class members' ability to change and/or cancel their flights.

140. Frontier's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff Tchorzewski and the New Jersey Class, about Frontier's future flight plans and its refund obligations. Frontier intentionally and knowingly misrepresented material facts regarding refund options available to Plaintiff Tchorzewski and New Jersey Class members with the intent to mislead the New Jersey Class.

141. Had Plaintiff Tchorzewski and the New Jersey Class known that Frontier was planning to cancel and/or seriously delay most future flights, and that doing so would entitle customers to full refunds, they would either not have pre-emptively canceled their flights for expiring "Frontier credit."

142. All members of the New Jersey Class, including Plaintiff Tchorzewski, suffered ascertainable losses caused by Frontier's failure to disclose material information.

143. Plaintiff Tchorzewski and New Jersey Class members have been damaged by Frontier's misrepresentations, concealment, and non-disclosure of Frontier's future flight plans and the refund options Plaintiff Tchorzewski and New Jersey Class members had, as they now hold only expiring, illusory "Frontier credits" that expose customers to further charges by Frontier.

144. Plaintiff Tchorzewski and New Jersey Class members risk irreparable injury as a result of Frontier's act and omissions in violation of the New Jersey CFA, and these violations present a continuing risk to them as well as to the general public. Frontier's unlawful acts and practices complained of herein affect the public interest.

145. As a direct and proximate result of Frontier's violations of the New Jersey CFA, Plaintiff Tchorzewski and the New Jersey Class has suffered injury-in-fact and/or actual damage.

146.    Plaintiff Tchorzewski and the New Jersey Class are entitled to recover legal and/or equitable relief including an order enjoining Frontier's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

147.    Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff Tchorzewski and the New Jersey Class will mail a copy of the complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

### COUNT VII
### VIOLATION OF NY DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (GBL § 349)
### (By Plaintiff Muters on behalf of the New York Class)

148.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

149.    New York General Business Law § 349 ("NY GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state…" NY GBL § 349(a).

150.    Any person who has been injured by reason of any violation of NY GBL § 349 "may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff." NY GBL § 349(h).

151.    Frontier's actions, as set forth above, occurred in the conduct of business, trade or commerce.

26

152.     In the course of Frontier's business, it willfully failed to disclose and actively concealed Frontier's future flight plans and its refund obligations, and instead attempted to convince customers pre-emptively cancel the airline tickets they purchased from Frontier in exchange for "Frontier credit"—credit which expired within 90 days. Accordingly, Frontier engaged in unfair and deceptive acts or practices.

153.     Frontier should have disclosed this information because they were in a superior position to know the true facts related to the Defect, and Plaintiff Muters and New York Class members could not reasonably be expected to learn or discover the true facts related to Frontier's plans to cancel or seriously delay future flights. Frontier, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff Muters and the New York Class members that it planned to cancel or seriously delay all future Frontier flights, which would entitled ticket holders to full monetary refunds.

154.     These acts and practices have deceived Plaintiff Muters and the New York Class and are likely to, and did, deceive the public. In failing to disclose Frontier's future plans and its obligation to ticket holders, and suppressing material facts from Plaintiffs and the Class members, Frontier breached its duties to disclose these facts, violated the NY GBL § 349, and caused injuries to Plaintiffs and the Class members. The omissions and acts of concealment by Frontier pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

155.     Frontier's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff Muters and the New York Class, about Frontier's future flight plans and its refund obligations. Frontier intentionally and knowingly misrepresented material facts

27

regarding Frontier's future flight plans and its refund obligations to Plaintiff Muters and New York Class members with the intent to mislead the New York Class.

156. Frontier's deceptive acts are material as they concern the flights that consumers purchased tickets for, as well as the rights and obligations ticket holders had when those flights were cancelled or delayed due to the COVID-19 pandemic. Had Plaintiff Muters and the New York Class known that Frontier was planning to cancel and/or seriously delay most future flights, and that doing so would entitle customers to full refunds, they would either not have pre-emptively canceled their flights for expiring, illusory "Frontier credit."

157. The sale and distribution in New York of the Frontier airline tickets (and the subsequent cancellation of those tickets) was a consumer-oriented act, and thereby falls under the New York deceptive acts and practices statute.

158. Frontier conduct proximately caused injuries to Plaintiff Muters and other New York Class members. Had Plaintiff Muters and the New York Class known about their rights to receive a full monetary refund, they would not have been tricked into pre-maturely cancelling their flights in exchange for expiring, illusory Frontier credits.

159. At all times, Frontier's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous.

160. Frontier's actions impact the public interest because Plaintiffs and members of the New York Class were injured in exactly the same way as thousands of others who purchased and subsequently pre-maturely cancelled their Frontier flights in exchange for illusory Frontier credits.

161. Frontier also has refused to act on grounds generally applicable to the injunctive relief sought by Plaintiff Muters, thereby making final injunctive relief appropriate.

162.     Frontier persists in its deceptive and unfair sales practices regarding the failure to provide full monetary refunds to consumers who purchased Frontier airline tickets, including Plaintiff Muters and the New York Class.

163.     If Frontier is allowed to continue with these practices, consumers, including Plaintiff Muters and the New York Class, will be irreparably harmed. Plaintiff Muters and the New York Class do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint unless injunctive relief is granted to stop Frontier's deceptive scheme to trick Frontier customers into accepting expiring, illusory "Frontier credit," in exchange for pre-emptively cancelling the customers' flights, so that Frontier can avoid providing a full monetary refund.

164.     Thus, Plaintiff Muters and the New York Class members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees, as well as injunctive relief requiring Frontier to cease its unfair and deceptive practices relating to the failure to provide full monetary refunds for Frontier flights during the COVID-19 pandemic.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class(es) as defined above;

B.     Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.     Award pre-judgment and post-judgment interest on such monetary relief;

E.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Frontier to issue refunds of ticket prices to any member of the class who requests a refund;

F.      Award reasonable attorney's fees and costs; and

G.      Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and the putative Class, demands a trial by jury on all issues so triable.

Dated: May 28, 2020          Respectfully submitted,

*s/ Kathryn J. Stimson*

Kathryn J. Stimson
Jamie Hubbard
**STIMSON STANCIL LABRANCHE HUBBARD, LLC**
1652 Downing Street
Denver, CO 80218
Phone:   720.689.8909
Email:    stimson@sslhlaw.com
             hubbard@sslhlaw.com

Daniel O. Herrera*
Christopher P.T. Tourek*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: 312-782-4880
Facsimile: 318-782-4485
dherrera@caffertyclobes.com
ctourek@caffertyclobes.com

Bryan L. Clobes*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
205 N. Monroe St.
Media, Pennsylvania 19063
Telephone: 215-864-2800
bclobes@caffertyclobes.com

Joseph G. Sauder*
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
jgs@sstriallawyers.com

*Attorneys for the Plaintiffs and the Putative
Class*

*\*Admission pro hac vice anticipated*

# EXHIBIT 3

Hassan A. Zavareei (SBN 181547)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Jeff Ostrow*
Jonathan M. Streisfeld*
Joshua R. Levine*
Daniel Tropin*
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: streisfeld@kolawyers.com
        ostrow@kolawyers.com

Melissa S. Weiner*
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email:  mweiner@pswlaw.com

Daniel L. Warshaw (SBN 185365)
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*pro hac vice application forthcoming

Counsel for Plaintiff and the Proposed Class

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FELIKS OBERTMAN, on behalf of himself and all others similarly situated<br><br>        Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES INC.,<br><br>        Defendant. | **CLASS ACTION COMPLAINT**<br><br>Case No.<br><br>**JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff, Feliks Obertman ("Obertman" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through undersigned counsel, files this Class Action Complaint against Frontier Airlines, Inc. ("Frontier" or "Defendant"), and alleges the following:

**INTRODUCTION**

1.      Frontier is the eighth-largest commercial airline in the United States, operating flights to over 100 destinations throughout the United States and 30 international destinations. Frontier typically operates around 300 daily flights. But this year, Frontier has responded to a sudden drop in demand for passenger air travel by canceling scores of scheduled flights.

2.      Under the terms of Frontier's uniform contracts with its customers, when the airline cancels a flight, the airline must either re-accommodate passengers on another flight or refund the passengers. Frontier has breached its contracts with thousands of paying customers by offering credits for future travel on the airline instead of providing refunds for flights canceled by the airline.

**Declining Demand in Light of Novel Coronavirus
Severely Impacts Frontier's Operations**

3.      On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness.   Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or SARS-CoV-2. The illness caused by the virus has been termed COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic cases of COVID-19.

4.      Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

5.      On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

6.      In efforts to curb the spread of the virus, federal, state and local governments have

implemented temporary travel restrictions and guidelines advising against essential travel. In the United States, the federal government has limited travel from China, Europe, and the United Kingdom, permitting only the return of U.S. citizens and permanent residents. The Department of State also advised on March 19, 2020, that U.S. citizens should temporarily avoid all international travel, with the exception that U.S. residents abroad should arrange for immediate return to the United States where possible.

7.      State and local governments have also restricted local travel. On March 16, 2020, seven counties in the San Francisco, California area announced shelter-in-place orders to reduce local traffic to activities necessary to perform "essential" activities. Other states, counties, and municipalities have since implemented similar shelter-in-place orders, and as of the drafting of this Class Action Complaint, at least 316 million people in at least 42 states, three counties, nine cities, the District of Columbia, and Puerto Rico are living under such orders.

8.      In addition to health and safety concerns, people across the country are facing increasing economic stress due to the novel coronavirus, including unemployment levels not seen since the Great Depression.

9.      As the travel limitations, virus fears, and economic uncertainties mounted, consumer demand for air travel, particularly leisure and non-essential business travel, quickly declined. In response to this declining demand, Frontier has cancelled many flights in the United States to avoid flying planes with too many empty seats to be profitable.

10.     The main way that airlines like Frontier determine operational capacity (*i.e.*, how many flights it markets and flies) is by looking at passenger "load factors" on each route. Load factors measure the percentage of seats filled on an aircraft (or set of aircraft) scheduled to depart. Load factors can be determined for an overall schedule (all flights to all destinations), for particular routes (all flights between two airports), or for particular flight service (a specific scheduled flight with its own flight number). If load factors fall too low, airlines will determine that operating flight service as

scheduled would not be profitable (or otherwise economically desirable) and will then typically modify the schedule—including by canceling previously scheduled flights

11.     Frontier's overall load factor is typically around 85-89%. But with declining customer demand in light of COVID-19, the airline has seen significant drops in its load factors.

12.     Driven by the drop in travel demand, Frontier decreased its total flight capacity by 90% in April. It plans to fly at only 35% of the usual flight capacity by May 2020.

### Frontier Offers Customers Credit Where Refunds Are Due

13.     When Frontier cancels a flight, its contracts with its passengers require the airline to either (1) reaccommodate and transport passengers to their destination on another flight; or (2) provide a full refund for any unflown flight segments. The contract terms governing cancellations by the airline do not give Frontier the option of providing customers with a "credit" for future travel on the airline instead of a refund.

14.     Nevertheless, after canceling as many as 90% of its scheduled flights, Frontier has offered many of its canceled passengers only two options: (1) rebook your flight—sometimes weeks or more from the original travel date—or (2) obtain travel credit.

15.     However, as will be explained below, Frontier's Contract of Carriage mandates refunds, not credits, in this situation.

16.     Instead of following the terms of its Contract of Carriage, Frontier is unilaterally pushing vouchers or credits on customers, making it impossible for many customers to request refunds, and denying refunds when legitimate requests are made.

17.     Frontier is placing its concern for its own financial stability ahead of the significant economic impacts its consumers are facing in this unprecedented economic downturn. In just over one month, over 22 million people in the United States have applied for unemployment benefits, and the U.S. unemployment rate has climbed to over 20%—the worst it has been since the Great Depression. As many as one-third of the 40 million renters in the U.S. are unable to make their rent,

and millions of people with home mortgages will likely face foreclosure. Meanwhile, Frontier is currently slated to receive an influx of government rescue funds, in the form of grants and loans that will likely be forgiven. These government bailout funds are tied to the airline's commitment to provide a minimum level of service to airline customers, and yet, Frontier is already failing to meet its commitments to existing customers who are owed refunds. Now more than ever, customers whose flights or reservations have been canceled by Frontier need the prompt refunds to which they are entitled.

18.     As numerous customers complained about this practice by Frontier and other airlines, the DOT issued an Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel ("DOT Notice").   The DOT Notice provides that the airlines must refund tickets if they cancel flights due to the novel coronavirus:

> The U.S. Department of Transportation's Office of Aviation Enforcement and Proceedings (Aviation Enforcement Office), a unit within the Office of the General Counsel, is issuing this notice to remind the traveling public, and U.S. and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats, that passengers should be **_refunded promptly_** when their scheduled flights are cancelled or significantly delayed. Airlines have long provided such refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had an unprecedented impact on air travel, **_the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged._**
>
> The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.
> **_Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight_**

*disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.* Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the carriers' obligation that could subject the carrier to an enforcement action.[1]

(emphasis added).

19. Thus, Frontier's failure to provide prompt refunds for canceled flights violates not only its own Contract of Carriage, but also federal law.

## PARTIES, JURISDICTION, AND VENUE

20. Feliks Obertman is a California citizen who resides in Elk Grove, California.

21. Defendant is a Colorado for-profit corporation having its principal place of business in Denver, Colorado.

22. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

23. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because this is the judicial district in which a substantial part of the events giving rise to the claims asserted herein occurred.

## GENERAL ALLEGATIONS

24. On March 17, 2020, Plaintiff purchased two roundtrip tickets for travel from Sacramento (SMF) to Denver Intl (DEN), for him and his wife. The flight was scheduled to depart on May 8, 2020.

---

[1] U.S. Dep't of Transportation, Enforcement Notice Regarding Refunds by Carriers given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel (Apr. 3, 2020), https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf.

25.     On March 21, 2020, Plaintiff purchased one additional roundtrip ticket for his daughter for the same flight—Sacramento (SMF) to Denver Intl (DEN).

26.     On or about March 23, 2020, Plaintiff received an email from Frontier informing him that the May 8th flight had been cancelled and he would be rebooked.

27.     On or about March 31, 2020, Plaintiff received an email from Frontier informing him that the reservation had been further modified and he was now booked on a flight scheduled to depart Sacramento on May 10, 2020.

28.     Plaintiff contacted Frontier and was informed that his two options were to accept this rebooked flight, two days after his originally scheduled trip, or take a credit for future travel on Frontier. Plaintiff requested a refund, but Frontier told him that option was not available to him. Having no need for a plane ticket on May 10, 2020, Plaintiff was forced to accept the credit subject to expiration.

29.     In sum, despite the fact that Plaintiff could not take the flight he booked because Frontier canceled it, Frontier failed to provide a refund to Plaintiff and, instead, only offered Plaintiff a voucher for use on a future Frontier flight.

### The Contract

30.     Every Frontier passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by Frontier's Contract of Carriage. *See* **Contract of Carriage, attached as Exhibit A.** Frontier drafted the Contract of Carriage.

31.     Section 18 of the Contract of Carriage governs in a situation where Frontier cancels a flight, as was the case for Plaintiff and other Class members. While there are a number of circumstances under which Frontier could cancel a flight, in every case, Frontier is required to provide a reasonable accommodation to the passenger's ticketed destination or refund the fare.

32.     The Contract of Carriage states in relevant part:

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel,

---

divert, or delay any flight without liability *except to provide a refund for the unused portion of the ticket.*

C. Delay, Misconnection, or Cancellation – In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. *If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing.* The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

*   *   *

E. Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

   1) Transport the passenger over its own route system to the destination; or
   2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, *provide passengers a refund of the cost of the unused portion of the ticket.*

Ex. A at § 18 (emphasis added).

33.     Section 20(B)(3) specifies that "[a] refund will be provided only to the original purchaser's form of payment."

34.     Further, under Frontier's Customer Service Plan, Frontier reiterates that in the event of a flight cancellation—whether caused by a controllable situation or an uncontrollable situation—Frontier will "provide you, upon request, a full refund of any unused portion of your ticket." **Exhibit B, Frontier Customer Service Commitment, ¶ 12.**

35.     Both Section 18 of the Contract of Carriage and paragraph 12 of the Customer Service Plan clearly provide for either rebooking or a refund in the event that Frontier cancels a flight. Neither provision provides for any "credit" for use on a future Frontier flight.

36.     Here, Plaintiff's flight was canceled, and Frontier only offered to rebook him on

CLASS ACTION COMPLAINT                                                          8

another flight two days after his and his families' originally scheduled travel date. Plaintiff informed

Frontier that the rebooked flight was not an acceptable alternative transportation and that Plaintiff

would not be taking that flight. Plaintiff had not used any portion of the roundtrip ticket for his trip.

Thus, pursuant to the terms of the Contract of Carriage, Plaintiff is entitled to a refund of the fare

for the roundtrip ticket in U.S. Dollars to his original form of payment. Ex. A at §§ 18; 20(B)(3).

## CLASS ACTION ALLEGATIONS

37.     Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks

certification of the following nationwide class (the "Class"):

> All persons in the United States who purchased tickets for travel on a
>
> Frontier Airlines flight scheduled to operate from March 1, 2020
>
> through the date of a class certification order, whose flight(s) were
>
> canceled by Frontier, and who were not provided a refund.

38.     Excluded from the Class are Defendant, any entity in which Defendant has a

controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries,

and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members

of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding

court system who may hear an appeal of any judgment entered. Also excluded from the Class is any

person who was reaccommodated and transported to their ticketed destination by Defendant or its

agents.

39.     Plaintiff reserves the right to amend or modify the Class definition with greater

specificity or division after having had an opportunity to conduct discovery.

40.     The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and

(c)(4).

41.     **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the

proposed class members include thousands of persons across all 50 states, there is significant risk of

inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

42. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Frontier's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

43. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

    a.    Whether Defendant's conduct breaches its Contract of Carriage;

    b.    Whether Defendant is required to give a refund, rather than credit on a future flight when it cancels a flight and cannot reaccommodate the passengers within a reasonable time of the original flight schedule;

    c.    Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

    d.    Whether Plaintiff and members of the Class are entitled to compensatory damages.

44. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct

and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., canceling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

45.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

46.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

47.    **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

## COUNT I - BREACH OF CONTRACT

48.    Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 46 above as if fully set forth herein.

49.    This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Defendant's breaches of its Contract of Carriage (the "Contract").

50.    Plaintiff, along with all putative class members, entered into a Contract with Defendant for provision of air travel in exchange for payment. This Contract was drafted by Defendant.

51.    Plaintiff, and all putative class members performed under the Contract, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

52.    Due to Defendant's cancellation of their flights, Plaintiff, and all putative class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

53.    Under the terms of the Contract of Carriage drafted by Defendant, Plaintiff and putative class members are entitled to refunds because Frontier canceled their flights and did not reaccommodate and transport the customers to their destinations on another flight. Contract of Carriage § 18(a)(1). By failing to provide refunds, Frontier has breached its Contract of Carriage.

54.    As a result of Defendant's breaches of contract, Plaintiff and the putative class members have incurred damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

1.   For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

2.   For himself and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contract of Carriage;

3.   For reasonable attorneys' fees and costs of suit;

4.   For pre-judgment interest; and

5.   Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 21, 2020

Respectfully submitted,

*/s/ Hassan A. Zavareei*

Hassan A. Zavareei (SBN 181547)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Jeff Ostrow*
Jonathan M. Streisfeld*
Joshua R. Levine*
Daniel Tropin*
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100

CLASS ACTION COMPLAINT                                                          13

1

Facsimile: (954) 525-4300
Email:  streisfeld@kolawyers.com
ostrow@kolawyers.com

2

3

Melissa S. Weiner*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email:  mweiner@pswlaw.com

4

5

6

7

Daniel L. Warshaw (SBN 185365)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

8

9

10

11

*pro hac vice* application forthcoming

12

*Counsel for Plaintiff and the Proposed Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT                                            14

# EXHIBIT A

# FRONTIER AIRLINES Contract of Carriage

**Effective Date:**   04/16/20

For a summary of changes, <u>click here.</u>

Case 1:20-cv-01053-RBJ-KDV Document 1-8 Filed 06/26/23 USDC Colorado Page 87 of 125



**CONTRACT OF CARRIAGE**                                                Rev 73 04/16/20

# LIST OF EFFECTIVE PAGES

| REVISION NUMBER | **73** | REVISION DATE | 04/16/20 |
|---|---|---|---|

| Chapter/Page | Revision/Date |
|---|---|
| 00.00 Pg. 1 | Rev36 04/13/11 |
| 00.00 Pg. 2 | Rev36 04/13/11 |
| 00.00 Pg. 3 | Rev 73 04/16/20 |
| Pg. 1 | Rev 73 04/16/20 |
| Pg. 2 | Rev 73 04/16/20 |
| Pg. 3 | Rev 73 04/16/20 |
| Pg. 4 | Rev 73 04/16/20 |
| Pg. 5 | Rev 73 04/16/20 |
| Pg. 6 | Rev 73 04/16/20 |
| Pg. 7 | Rev 73 04/16/20 |
| Pg. 8 | Rev 73 04/16/20 |
| Pg. 9 | Rev 73 04/16/20 |
| Pg. 10 | Rev 73 04/16/20 |
| Pg. 11 | Rev 73 04/16/20 |
| Pg. 12 | Rev 73 04/16/20 |
| Pg. 13 | Rev 73 04/16/20 |
| Pg. 14 | Rev 73 04/16/20 |
| Pg. 15 | Rev 73 04/16/20 |
| Pg. 16 | Rev 73 04/16/20 |
| Pg. 17 | Rev 73 04/16/20 |
| Pg. 18 | Rev 73 04/16/20 |
| Pg. 19 | Rev 73 04/16/20 |
| Pg. 20 | Rev 73 04/16/20 |
| Pg. 21 | Rev 73 04/16/20 |
| Pg. 22 | Rev 73 04/16/20 |
| Pg. 23 | Rev 73 04/16/20 |
| Pg. 24 | Rev 73 04/16/20 |

# FRONTIER

**CONTRACT OF CARRIAGE**                                          Rev 73 04/16/20

## Table Of Contents

| Section | Subject | Page |
|---|---|---|

1. Introduction ........................................................... 2
2. Definitions ........................................................... 2
3. Refusal to Transport and Special Conditions ........................... 3
4. International Transportation .......................................... 6
5. Child Passengers ..................................................... 6
6. Service Animals ...................................................... 8
7. Smoking .............................................................. 9
8. Tickets .............................................................. 9
9. Ticket Validity and Itinerary Changes ................................ 10
10. Check-in Times ...................................................... 11
11. Fares ............................................................... 11
12. Checked Baggage ..................................................... 12
13. Carry-On Baggage .................................................... 13
14. Cabin-Seat Baggage .................................................. 14
15. Conditions and Charges for Special Items ............................ 14
16. Limitations of Liability ............................................ 17
17. Claim Limits and Procedures ......................................... 17
18. Failure to Operate on Schedule or Failure to Carry .................. 19
19. Denied Boarding Compensation ........................................ 20
20. Refunds; No-Show Cancellations and Service Charges .................. 21
21. Currency and Mode of Payment and Fees ............................... 23
22. Miscellaneous ....................................................... 23



**CONTRACT OF CARRIAGE**                                      Rev 73 04/16/20

## 1.  Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier") as well as that transportation regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.  Definitions

A. **Codeshare** – A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **Code** – The U.S. Internal Revenue Code of 1986, as amended.

C. **DOT** – U.S. Department of Transportation.

D. **FAA** – U.S. Federal Aviation Administration.

E. **Fare Rules** – The rules and requirements associated with a ticket.

F. **IATA** – International Air Transport Association.

G. **No-Show Cancellation** – The automatic cancellation of a passenger's ticket upon such passenger failing to either (i) check-in for such passenger's flight, or (ii) board such passenger's flight, in either instance within the required times. The automatic cancellation will apply to all subsequent flights, including return flights, on the itinerary. Presentation of a ticket by someone other than the named passenger renders the ticket void and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage (see section 20. )

H. **Qualified Individual with a Disability** – An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

I. **Standby Passenger** – A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

J. **Stopover** – An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

K. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

L. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

M. **TSA** – U.S. Transportation Security Administration.

---

**FRONTIER**

CONTRACT OF CARRIAGE                                                Rev 73 04/16/20

## 3.  Refusal to Transport and Special Conditions

A.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

    1)  Government Request – To comply with a government requisition of space or request for emergency transportation, e.g., in connection with national defense or natural disaster (actual, threatened or reported).

    2)  No Seat for Safety Assistant - If a passenger requires a safety assistant (see section 3. B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

    1)  Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

    2)  Identification – The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

    3)  Passports/Visas – The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

    4)  Failure to Check In or Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times. (The ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 2O)).

    5)  Special Medical Requirements – The passenger will be refused transport if he or she requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.

        EXCEPTION:   A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization form (30881) available on Frontier's website or obtain a medical statement from his/her physician addressing the points on the POC Medical Authorization form.

---

Pg. 3 of 24                                          **Refusal to Transport and Special Conditions**



**CONTRACT OF CARRIAGE**                                                    Rev 73 04/16/20

NOTE:     Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.

6) Qualified Individual with a Disability – If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in his/her own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

7) Prisoners - If transportation is refused because of a failure to comply with the following: Frontier accepts up to two "low risk" prisoners with hand restraints per flight. If the flight is 4 hours or less, at least one armed or unarmed law enforcement officer must accompany the prisoner(s). If the flight is more than 4 hours, at least two armed or unarmed law enforcement officers must accompany the prisoner(s). At no time may any prisoner be left unattended. No prisoners are accepted on codeshare itineraries.

8) Resistant Prisoners - Any prisoner who has resisted or is reasonably believed to be capable of resisting his/her escort.

9) Proper Attire - Any passenger who is barefoot and over 5 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed.

10) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.

11) Communicable Disease or Infection - A passenger who has a communicable disease or infection that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented with specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures will include, but not be limited to, a required separation between the passenger and other persons, use of medical equipment not permitted to be used on the aircraft, a requirement that any person wear protective gear including gloves.

12) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

13) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

14) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person. (This ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

15) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

16) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

17) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

18) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

19) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.

3) Misconduct - A person who has committed a fraudulent act against Frontier.

D. Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seat(s), or encroaching into the aisle or adjacent seat(s), the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

E. Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F. Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks. Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.


**CONTRACT OF CARRIAGE**  Rev 73 04/16/20

G. Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

H. Diversion - In the event that Frontier is required to divert an aircraft because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

## 4.  International Transportation

A. Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from his/her failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from his/her failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C. Customs Inspection - If required, a passenger must attend the inspection of his/her baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.

D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from his/her failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

## 5.  Child Passengers

A. Accompanied Children – Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

Case 1:20-cv-01534-AB-KDW Document 1-8 Filed 06/26/23 Pa Colorado Page 84 of 125
Case 2:20-at-00395    Document 1-1    Filed 04/21/20    Page 10 of 28


B. Unaccompanied Children

1) Frontier does not allow children under the age of 15 years old to travel unaccompanied; they must be accompanied by a passenger who is at least 15 years old. Passengers who are 15 years old or older may travel on Frontier without an adult companion. A birth certificate, official school ID, or other form of ID may be requested for age verification purposes if the child's age appears questionable.

   NOTE:    *Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

C. Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

1) Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a fare-paying passenger at least 15 years old. A birth certificate may be requested for age verification purposes if the infant's age appears questionable.

   NOTE:    *Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

2) One adult may accompany up to two infants under the age of 2.

   a) When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

3) Children 7 days - 14 years of age occupying a seat are charged the same fare as an adult passenger.

   NOTE:    *Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*

D. Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

1) Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

2) Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

3) Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

   NOTE 1:    *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

   NOTE 2:    *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4) Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

Case 1:20-cv-01643-RAB-KDM Document 1-1 Filed 06/26/23/23 DSC Colorado Page 85 of 125
Case 2:20-at-00395   Document 1-1   Filed 04/21/20   Page 11 of 28



5) Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

   a) It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

   b) It must have a solid seat and solid back.

   c) It must have restraint straps installed to hold the child in the car seat.

   d) The child may not exceed the weight limitation of the car seat.

   e) It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

   f) Window seats are the preferred location for a car seat, so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

   g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried on-board aircraft but must be stowed in an overhead compartment or underneath the seat for take-off and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.

## 6.  Service Animals

A. General - The following categories of service animals are allowed in the cabin without charge.

1) Trained service animals assist passengers with disabilities. As evidence that an animal is a trained service animal, the passenger must present an identification card or other written documentation, the animal must have a harness, tag, or the passenger must give credible verbal assurances that he/she is a qualified individual with a disability using the animal. Only dogs, cats or miniature horses will be accepted as trained service animals. The animal must be at least 4 months old. The passenger is required to keep the animal under control at all times, with the animal on a leash or harness while in the boarding area and onboard the aircraft. Psychiatric support animals are recognized as trained service animals.

2) Emotional support animals provide support for passengers with mental health-related disabilities. Only dogs or cats, at least 4 months old, will be accepted as an emotional support animal. Only one emotional support animal per passenger will be allowed. The passenger must keep the animal under control at all times, with the animal on a leash, harness or in a carrier while in the boarding area and onboard the aircraft. As evidence that the animal is required for that purpose, the passenger must present:

   a. A Frontier Medical/Mental Health Professional Information form completed by a mental health professional (e.g., psychiatrist, psychologist, licensed clinical social worker, including a medical doctor specifically treating the passenger's mental or emotional disability) stating the following:

   (i) the passenger has a mental or emotional disability recognized in the Diagnostic and Statistical Manual of Mental Disorders — Fourth Edition (DSM IV),

   (ii) the passenger needs the emotional support animal as an accommodation for air travel or for activity at the passenger's destination,


**FRONTIER**

CONTRACT OF CARRIAGE                                                    Rev 73 04/16/20

    (iii) the individual providing the assessment is a licensed mental health professional, and the passenger is under his or her professional care, and

    (iv) The date and type of the mental health professional's license and the state or other jurisdiction in which it was issued.

    b.  A Frontier Veterinary Health Form completed and signed by Veterinary Professional indicating the following:

    (i) Rabies Vaccine Given (date)

    (ii) Rabies Vaccine Valid Through (date)

    (iii) Veterinarian License number

    (iv) Date Veterinarian License Issued

    (v) State License Issued In

    (vi) Name of Practice

    (vii) Phone

    c.  A Frontier Passenger Acknowledgment form completed and signed by the passenger.

These forms must be completed and submitted 48 hours prior to departure.

3) Service Animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose will be accepted for travel. The passenger must present credible documentation the animal is traveling for that purpose.

B. Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap. If the passenger is seated in row 1, the animal will not be allowed on the passenger's lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

C. International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel with a service animal or emotional support animal. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

D. Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

# 7.  Smoking

A. Smoking is prohibited on all flights.

B. Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C. The use of electronic smoking devices is prohibited at all times on all aircraft.

# 8.  Tickets

A. A passenger is entitled to transportation only upon presentation of a valid electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

Case 1:20-cv-01083-RBJ-KLM Document 1-1 Filed 04/23/20 USDC Colorado Page 87 of 125



**CONTRACT OF CARRIAGE** <span style="float:right">Rev 73 04/16/20</span>

NOTE: *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*

B. Tickets are honored only in the order in which they are issued.

C. The following practices are prohibited:

   1) Back to Back Ticketing – The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

   2) Throwaway Ticketing – The purchase or use of round-trip tickets for one-way travel.

   3) Hidden City/Point Beyond Ticketing – The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D. A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E. The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the passenger.

F. A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket.

G. Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation, and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage (see section 20. )

H. An additional processing fee will apply to each ticket purchased or changed via Frontier's reservation center or at its airport counters, except (i) tickets purchased by an Elite member for themselves (a fee does apply to purchases by such members for others), and (ii) issuing an international ticket for infant taxes for an infant not occupying a seat.

## 9. Ticket Validity and Itinerary Changes

A. Period of Validity

   1) Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter. If a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee will be retained for 90 days from the date of cancellation of the ticket in the form of an electronic credit. The credit has no cash or refund value and may only be applied to a single subsequent ticket on a Frontier flight for the same passenger as the original ticket. In the case of a No-Show Cancellation, see section 20.

   2) Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule any passenger(s) who cancels a ticket before the scheduled flight departure time or to provide them with any refund or other credit for unused tickets.

   3) Except as required by law or as provided in this Contract of Carriage, in the case of a No-Show Cancellation, Frontier shall have no obligation of any kind to reschedule any such passenger(s) on any other flight, and the rules respecting No-Show Cancellations shall apply (see section 20. )

B. Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be canceled within twenty-four (24) hours of the purchase and a full refund will be given. After that time, except for tickets that are purchased as refundable, all tickets are non-refundable.


**FRONTIER**

**CONTRACT OF CARRIAGE**                                              Rev 73 04/16/20

## 10. Check-in Times

A. Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, including processing through the security check point with enough time to complete check-in and security screening processes.

B. Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at www.FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C. Check-In Times

   1) For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

   2) For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 60 minutes prior to scheduled departure.

D. Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E. Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F. Failure to Check In or Appear - If a passenger fails to check in or board the flight within the required time, the ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20).

G. Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operated by any other airline will be canceled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

## 11. Fares

A. Fares apply for transportation only between the airports for which they are published.

B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.



**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

## 12. Checked Baggage

A. Fees applicable to checked baggage:

   1) Baggage fees apply to each checked bag.

   2) Active U.S. military personnel, with Common Access Card (CAC), may check two bags at no charge for all types of tickets. Overweight and/or oversize charges for the first two free bags are also waived. This policy is for active U.S. military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

   1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

   2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

   3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

   1) Checked baggage may not exceed 62 inches (157 cm) in linear dimension (height plus length plus width), nor more than 180 inches (457 cm) in any of those dimensions or weigh more than 50 pounds (22.6 kilograms). Additional fees apply to items that exceed those size and weight limitations. Baggage weighing 100 or more pounds (45 kilograms) is not accepted.

*NOTE 1:      For baggage checked to or from Canada, no baggage weighing more than 70 pounds (31.75 kilograms) will be accepted.*

   2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.

   3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight or character that renders it unsuitable for transportation will not be accepted.

   4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to section 17. )

   5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

   6) Frontier will not accept baggage or other personal property for storage.

Case 1:20-cv-01503-FAB-RAB-KDW Document 1-1 Filed 06/26/23/20 SD DSC Carolana Page 90 of 125

# FRONTIER

**CONTRACT OF CARRIAGE**                                     Rev 73 04/16/20

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

   a) To a point that is not reflected on the passenger's ticket.

   b) Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to section 17. )

D. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 13. Carry-On Baggage

A. Passengers are permitted up to two carry-on items:

   1) One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit within the personal item portion of the bag sizer.

   2) One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased. Active U.S. military personnel, with Common Access Card (CAC), may take a carry-on item free of charge for all types of tickets.

   3) Items that exceed these dimensions or are in excess of the allowance will be gate checked to which a fee will apply.

B. The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C. The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

Case 1:20-cv-01504-RA-KD Document 21-8 Filed 06/26/23 Page 92 of 125


**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

D. Use of Portable Electronic Devices (PEDs)

1) Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers and mobile phones and may be used during all phases of flight when in airplane mode including taxi, take-off and landing. However, if using them during taxi, take-off and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound, e.g., music or video players or games, may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Cabin-Seat Baggage

A. Cargo stowed inside the main cabin of the aircraft and occupying a passenger seat is referred to as "Cabin-Seat Baggage." Cabin-Seat Baggage may be transported on flights operated by Frontier subject to the following conditions:

1) The full fare for the ticket for the applicable seat is paid. There is no carry-on baggage allowance or baggage allowance for that ticket. If the Cabin-Seat Baggage must be accommodated into a STRETCH seat due to its size or at the passenger's request, the STRETCH seat fee applies.

2) The Cabin-Seat Baggage must be packaged or covered in a manner to avoid possible injury to passengers and crew.

3) The Cabin-Seat Baggage must be carried aboard the aircraft by the passenger.

4) The Cabin-Seat Baggage may not weigh more than 100 pounds (45 kilograms).

5) The Cabin-Seat Baggage cannot exceed size dimensions of 57" height x 17.84" width x 9.3" depth (144.78 cm x 45.31 cm x 23.62 cm).

6) The Cabin-Seat Baggage must fit in the seat without blocking aircraft signage or extending into the aisle and be secured with a seatbelt or other approved method.

7) Certain seats may not accommodate Cabin-Seat Baggage. Frontier will assign seats as appropriate.

8) Except as provided herein, Frontier is not responsible for damage to Cabin-Seat Baggage.

9) Cabin-Seat Baggage does not count toward the passenger's baggage allowance.

## 15. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

**CONTRACT OF CARRIAGE**                                            Rev 73 04/16/20

NOTE:  *Refer to the Sports Equipment and Special/Fragile Items chart hosted at <u>www.FlyFrontier.com</u> for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.*

A. Firearms – Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:

   1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

   2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

   3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

   4) After screening, the passenger must lock the firearm container and retain the key or combination.

   5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

   1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

   2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

   3) Loaded ammunition clips and magazines must also be securely boxed.

   4) Ammunition may be packed with the firearm.

C. Live Animals – Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

   EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

   1) Only the following animals are permitted:

      a) Domestic Flights – Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

      b) International Flights – Domesticated dogs and cats.

   2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

   3) The passengers carrying the animal are responsible for paying any import/export fees, duties or taxes that may apply as well as any fines for failing to comply with applicable law.

   4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.



**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

6) No passenger may carry more than one pet container.

7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

   a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

   b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

   c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) – Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways, and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

**FRONTIER**

CONTRACT OF CARRIAGE                                                    Rev 73 04/16/20

## 16. Limitations of Liability

A. Consequential Damages – Unless it is specifically stated otherwise in this Contract of Carriage, or as required by any applicable law, Frontier is not liable for any indirect, special or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation.

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, and as if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

## 17. Claim Limits and Procedures

A. Limitations of Liability

  1) Domestic Flights – With respect to domestic flights, i.e., those flights originating and ending within the United States without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,500 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

     i)  the following items included in checked baggage, with or without the knowledge of Frontier:

- alcohol
- antiques
- art, paintings
- art supplies
- artifacts
- bags made from lightweight material not designed for shipping
- blueprints
- books
- business documents
- CDs
- cell phones
- Cigars, cigarettes, electronic cigarettes, vape pens
- collectibles
- computer equipment (including hardware, software and all accessories)
- dentures
- drugs prohibited by federal or state law
- DVDs
- eyeglasses
- files
- food/perishables
- fragile articles or other similar valuable items and commercial effects
- hand and power tools
- heirlooms
- irreplaceable items
- jewelry
- keys
- machinery and its parts
- manuscripts
- medication
- money
- natural fur products
- negotiable papers/ instruments
- optics
- orthodontics
- orthotics
- photographic/video/ electronic equipment and accessories
- precious metals or stones
- publications
- samples
- securities
- silverware
- sound reproduction equipment
- sunglasses
- surgical supports
- toys


**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

    ii)   articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

    iii)  damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item.

- Prosthetic devices
- Medical equipment
- Musical instruments
- Recreational or sporting equipment
- Baby items including car seats and strollers

    iv)  damage to handles, straps, wheels and zippers arising from normal wear and tear caused by ordinary handling of baggage.

    v)  damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

    vi)  damage resulting from over- packing or misuse

    vii) damage arising from liquids on or in baggage; including weather (e.g. rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,288 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the documented original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.


Case 1:20-cv-01450-RBJ-KLM Document 1-1 Filed 06/06/23/20 USDC Colorado Page 96 of 125
Case 2:20-at-00395 Document 1-1 Filed 04/21/20 Page 22 of 28

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay or loss of baggage must be reported to Frontier within 4 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at his/her disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 18. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage. Frontier may substitute alternate aircraft, change schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Frontier's sole discretion. Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger, are set forth below.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.



**CONTRACT OF CARRIAGE** Rev 73 04/16/20

D. For purposes of involuntary reroute, the following groups of cities are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

- Chicago-O'Hare (ORD) /Milwaukee (MKE)
- Ft. Lauderdale (FLL) /West Palm Beach (PBI) / Miami (MIA)
- Los Angeles (LAX) /Orange County (SNA)
- Madison (MSN)/Milwaukee (MKE)
- New York La Guardia (LGA) /Trenton (TTN) /Philadelphia (PHL)
- Orange County (SNA) /San Diego (SAN)
- Orlando (MCO) /St. Augustine (UST)
- Orlando (MCO) /Tampa (TPA)
- Washington Dulles (IAD) /Washington National (DCA)

E. Schedule Change Prior to Day of Travel – When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

1) Transport the passenger over its own route system to the destination; or

2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, provide passengers a refund of the cost of the unused portion of the ticket.

F. Extended Onboard Ground Delays – In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 19. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A. Voluntary – Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Certificate for future transportation within 90 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B. Involuntary – If insufficient passengers volunteer, passengers who check in after all seats have been assigned will be denied boarding and Frontier will provide transportation on Frontier's flights to the same destination.

C. Amount of Compensation – Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $675 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1350 |


NOTE 1:     Frontier will not provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.

NOTE 2:     No compensation will be due if boarding is denied for reasons other than overbooking, e.g., pursuant to applicable law or other provisions of this Contract of Carriage.

D. Onward Transportation for Passengers Denied Boarding

1) A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on Frontier's next available flight on which space is available and at no additional charge.

2) If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no additional charge.

E. Electronic Travel Certificates - Frontier may offer passengers denied boarding involuntarily an Electronic Travel Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section. Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel Certificate has no refund value, will expire 90 days from date of issuance, is not transferable and may only be used to purchase tickets for the passenger to whom it is issued. Only one Electronic Travel Certificate may be used per ticket at the time of purchase. Electronic Travel Certificates may not be applied to ancillary fees and charges, e.g., seat fees, baggage fees, etc., applied to group travel, or combined with other offers. If a ticket purchased with an Electronic Travel Certificate costs less than the amount of the certificate, no residual value remains. Changes to a ticket purchased with an Electronic Travel Certificate may result in a change fee and any additional fare difference based on the rules of the issued ticket.

F. Time of Offer and Payment of Compensation

1) The offer of compensation for overbooking will be made by Frontier on the day and at the place where the failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If the alternative transportation arranged for the passenger's convenience departs before the payment can be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

2) Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

## 20. Refunds; No-Show Cancellations and Service Charges

A. The provisions of this Section (20.A) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) All refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

2) The first portion of any amount refunded will be the full amount of taxes and fees imposed on the ticket purchase.

3) If applicable, cancellation fees or service charges will be assessed in a separate transaction and netted against the refunded amount.

4) No Use - If no portion of the ticket has been used, the refund amount will be equal to the fare, plus any ancillary purchases (checked or carry-on bag, seat assignments, etc.) and all charges, taxes and fees paid for the ticket issued to the passenger.

5) Partial use - If a portion of the ticket has been used:

Case 1:20-cv-01504-AB-RAB Document 1-1 Filed 06/23/20 USDC Colorado Page 99 of 125


**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

a) One-way ticket: If travel was terminated at an intermediate or stopover point, the refund amount will be equal to the amount of the fare and all ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount, plus all charges, taxes and fees proportionately attributable, which shall be reasonably determined by Frontier.

b) Round-trip ticket purchased: the refund amount will be equal to the amount of the fare and ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid on the unused portion of the ticket, plus all charges, taxes and fees proportionately attributable, which shall be reasonably determined by Frontier.

B. In addition to the provisions of Section 20.A, in situations other than No-Show Cancellations, the provisions of this Section (20.B) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) For refundable tickets that are canceled prior to flight departure, passengers should fill out an online request, available at   www.FlyFrontier.com.

2) For tickets that are canceled up to 24 hours after the time of purchase (excluding tickets purchased within seven days before travel, which will be held as a credit, subject to a cancellation fee), passengers should cancel their tickets online at www.FlyFrontier.com.

3) Payment - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency. The Table below illustrates other rules respecting payment:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Credit Card | The account of the person to whom the credit card was issued |
| Travel Voucher | The original voucher will be reinstated if the cancellation is within 90 days of the voucher issue date |

4) Identity - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

C. In situations involving a No-Show Cancellation, in addition to the provisions of Section 20.A, the provisions of this Section (20.C) shall apply with respect to refunds for tickets under this Contract of Carriage.

1) Automatic Refund; No Additional Submission Required – In the case of a No-Show Cancellation, the refund described in Section 20.A shall be automatically refunded to the purchaser.

2) Automatic Imposition of a No-Show Cancellation Service Charge.

---

Case 1:20-cv-01531-RBJ Document 1-1 Filed 06/26/20 USDC Colorado Page 100 of 125


CONTRACT OF CARRIAGE                                               Rev 73 04/16/20

a) Refund – The refund described in Section 20.A shall be given, but will be netted against the No-Show Cancellation Service Charge in a separate transaction.

b) Imposition of a No-Show Cancellation Service Charge – A No-Show Cancellation Service Charge will apply with respect to the ticket (or the segment for which the No-Show Cancellation applies) in the amount of the fare plus all ancillary purchases plus all charges, taxes and fees attributable to the fare and ancillary purchases.

c) The payment of the No-Show Cancellation Service Charge shall not entitle the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) to transportation.

D. To the extent required by applicable law, including Code § 6415(a) and the regulations promulgated thereunder, the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) hereby consents to Frontier recovering any allowance of a credit or refund of any overpayment of governmental fees or tax imposed, including pursuant to Code § 4261, including in each case which overpayment arises directly or indirectly as a result of a No-Show Cancellation as contemplated in this Contract of Carriage.

## 21. Currency and Mode of Payment and Fees

A. Fares, fees, charges, and taxes charged or collected by Frontier are due in United States dollars, except for bookings made through available Canadian online travel sites, which are due in Canadian dollars. Any purchases made in connection with such bookings would also be due in Canadian dollars.

B. All amounts due to Frontier must be paid with a credit card. Frontier does not accept cash for any transactions, including those on Frontier's aircraft.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks, or money orders.

D. A service charge will apply to any improper chargeback on a credit card and may be charged to the same credit card via which the chargeback is made.

## 22. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders, and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

D. No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.

E. Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

Case No. 1:20-cv-01153-PAB-MKLB Document 21-4 filed 06/08/20 USDC Colorado pg 42 of 525



**CONTRACT OF CARRIAGE**                                    Rev 73 04/16/20

F. Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

G. Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

H. No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

I. Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

J. Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

K. Codeshare Flights – Except for baggage policies (see section 12. , section 13. , and section 15. ), the policies, rules, and procedures of the operating airline will apply on any codeshare flight.

Case 1:01-cv-20151-PAB-KLM Document 21-14 Filed 06/08/20 USDC Colorado Page 102 of 125
Case 2:20-cv-00395  Document 1-1  Filed 04/21/20

# FRONTIER

## Contract of Carriage

REVISION NUMBER: ___73___

REVISION DATE: ___04/16/20___

«FirstName» «LastName»
«Dist_Loc»

**Instructions for paper manuals:**

**For an online version of Contract of Carriage, click here.**

1. Insert the attached revision as instructed below.
   - o  Pages to be removed are listed in the left-hand column. A horizontal line in this column means no pages are to be removed.
   - o  Pages to be inserted are listed in the middle column. A horizontal line in this column means no pages are to be inserted.
   - o  A description of the revision is found in the right-hand column.
2. Fill in the Revision Date, Date Posted, and Posted By fields on the **Record of Revisions** page.
3. Direct questions regarding this revision to: **Tech Pubs at 720-374-4341.**

| REMOVE PAGES | INSERT PAGES | REVISION HIGHLIGHTS | Page 1 of 1 |
|---|---|---|---|
| | | <u>Changes made per PCR 20-201</u> | |
| 00.00 Pg. 3 | 00.00 Pg. 3 | **List of Effective Pages** – Updated | |
| Pgs. 1-24 | Pgs. 1-24 | **Updated:**<br>Table of Contents<br>17. Claim Limits and Procedures<br>18. Failure to Operate on Schedule or Failure to Carry | |

Case 2:20-cv-01531-PBT Document 14 Filed 06/03/20 USDC Colorado Page 440 of

TRAVEL ALERT                                                      Sign up for our latest deals!

**We are committed to your health and safety. Learn more here.**

Legal / **Customer Service Plan**

# CUSTOMER SERVICE PLAN

## 1. OFFER THE LOWEST AVAILABLE FARE

Our lowest fares are available on our website, FlyFrontier.com. Certain fares such as internet promotions, may not be available to our reservations agents and are only available at FlyFrontier.com.

## 2. COMMUNICATE DELAYS AND FLIGHT DISRUPTIONS

We know it's important to keep customers informed and we'll make every reasonable effort to ensure we provide accurate, up-to-date flight information. We will update customers about delays, cancellations and diversions.

We recommend you add your email address and phone number to your reservation, either when you book at FlyFrontier.com or afterwards by updating your *Manage my Booking* page through logging My Trips.

## 3. DELIVER BAGS ON-TIME

When you arrive at your destination, we always try to ensure your checked baggage is there too. If your baggage does not arrive on your flight, please go to our Baggage Service Office, located in the baggage claim area or to our ticket counter, to report your delayed bag. If your bag does not arrive, we require that you report this to us within 12 hours of your arrival. The customer service agent will create a tracing file and will provide an update regarding the status of your baggage.

We will get you on your way as quickly as possible and cover your immediate, reasonable needs while you wait for your baggage. We'll make every reasonable effort

# EXHIBIT B

Case 1:20-cv-01531-RBJ-MEH Document 34-1 Filed 06/26/20 USDC Colorado Page 106 of 125
Case 2:20-at-00895 Document 1-2 Filed 04/21/20 Page 3 of 7

to find your baggage and get it back to you.

We encourage you to place your contact information both on the inside and outside of all checked and carry-on baggage. We will attempt to contact any person named on a bag when we find an unclaimed, checked bag that contains a name and address or a telephone number.

*RECOMMENDATION: Items of necessity such as medication, keys, passports and anything of significant value (such as electronic devices, computers, cameras and jewelry) should be packed in your carry-on baggage.*

## 4. ALLOW RESERVATIONS TO BE HELD OR CANCELLED WITHOUT PAYMENT

Frontier does not allow reservations to be held without payment.

Refunds are provided for reservations made seven days (168 hours) or more prior to your scheduled departure, provided the refund is requested within 24 hours of your initial reservation.

## 5. PROVIDE PROMPT TICKET REFUNDS

Once the proper documentation is provided, we will process refunds for eligible domestic and international tickets within seven (7) business days of receiving the completed refund request. Due to billing cycles, a credit card statement may not reflect a refund immediately.

If you purchased the WORKS℠, you may cancel your ticket on your *Manage my Booking* page through logging into My Trips. After cancelling, you may complete and submit the Online Refund Form if you would like a refund to your original form of payment.

## 6. PROPERLY ACCOMMODATE CUSTOMERS WITH DISABILITIES AND OTHER SPECIAL NEEDS

We are dedicated to meeting the travel needs of each of our customers, including those with disabilities and other special needs. We'll provide point of contact information for travelers with special needs at our ticket counters, gates, when calling our Reservations Department at 801-401-9000, or by filling out an Online Form.

Find detailed information to help passengers with special needs plan for their travel on our Special Service page.

## 7. MEET CUSTOMERS' ESSENTIAL NEEDS DURING LENGTHY ON-BOARD DELAYS

Case 1:20-cv-01153-PAB-MLM Document 11-4 Filed 06/26/20 USDC Colorado Page 4 of 7
Case 2:20-at-00395 Document 1-2 Filed 04/21/20 Page 4 of 7

Sometimes a flight may be delayed or ground-held before takeoff or receive a takeoff clearance from Air Traffic Control, after landing at your destination or during a diversion to another airport. These delays, known as "tarmac delays," are rarely of extended duration. If, however, your flight experiences an extended tarmac delay after you have boarded or after the plane has landed, we commit to providing timely information on the situation. We will also provide for your essential needs including, as safety and security conditions allow, food, water, operable restroom facilities, and, access to medical treatment. Please see our Extended Tarmac Delay Contingency Plan for more details.

# 8. TREAT CUSTOMERS ON "OVERBOOKED" FLIGHTS FAIRLY

In the event that a flight is overbooked, we will solicit volunteers to give up their seats. As thanks for the cooperation of these volunteers, we provide alternative travel accommodations and an electronic voucher usable toward future transportation on a Frontier flight. It is our goal to find enough volunteers so that no customers are denied boarding involuntarily.

If there are not enough volunteers, other passengers who check in after all seats have been assigned may be denied boarding involuntarily. If you are involuntarily denied boarding, we will give you a written statement that describes your rights and explains how we determine boarding priority for an oversold flight. If there are fewer seats available than people who have checked in, generally, the last customer to check-in would be subject to removal.

In order to minimize the likelihood of getting denied boarding involuntarily, it is important that you check-in as early as possible. You can Check-In up to 24 hours in advance of your scheduled flight at FlyFrontier.com.

# 9. DISCLOSE TRAVEL ITINERARY, CANCELLATION POLICIES, MILEAGE  PROGRAM RULES AND AIRCRAFT CONFIGURATION AND LAVATORY AVAILABILITY

We'll gladly provide you with detailed information about our policies, products, aircraft configurations and services.

This information is available on our website at the following links:

- *FRONTIER Miles*® frequent flyer terms and conditions
- Cancellation Policies and other policies that apply to your ticket
- Aircraft configuration, including seat width, pitch ranges and lavatory availability.
- All Travel on Frontier is subject to the terms of our Contract of Carriage.

Case No. 1:20-cv-01153-RBJ Document 31-4 filed 06/26/20 USDC Colorado pg 48 of

# 10. PROVIDE NOTIFICATION CHANGES TO YOUR TRAVEL ITINERARY

In the event a schedule change impacts your upcoming travel itinerary, we will send you an email to notify you of the change if we have your email address. If you purchased your ticket though a travel agency, including an online travel agency, we will notify the agency of the itinerary change so they can contact you about the change.

# 11. BE RESPONSIVE TO CUSTOMER FEEDBACK AND CONCERNS

We value feedback from our customers to help us learn what we're doing well, as well as where we can improve. Our Customer Relations Department handles all of your feedback and ensures the information is circulated to the appropriate departments within Frontier.

You may contact us in three ways with your compliments, complaints or questions.

1. Via our online Feedback Form.
2. In writing, you may send written correspondence to us at:

   Frontier Airlines, Inc.
   Attn: Customer Relations
   PO Box 492085
   Denver, CO 80249

   *We will acknowledge receipt of written complaints and concerns within 30 days of receiving the correspondence, and we promise to have a substantive response within 60 days of receiving the correspondence.*

3. By a phone call at 801-401-9000. Say "other options" at the first prompt, and say "feedback and concerns" at the second prompt.

# 12. PROVIDE FOR CUSTOMERS INCONVENIENCED BY A FLIGHT DELAY, DIVERSION, CANCELLATION, OR MISCONNECTION

When it comes to flight delays and cancellations, some situations are within our control and others are not.

Here's how we describe the difference:

- **Controllable Situations** are defined as delays, diversions, cancellations or service delivery failures considered within Frontier's control (such as delayed baggage or flight delays and cancellations caused by some types of aircraft damage, mechanical issues, etc.). If your flight is delayed, cancelled, diverted, or if you miss a connecting flight due to controllable situations, we'll do our best to get you to

Case 1:20-cv-01531-RBJ-MJW Document 1-4 Filed 06/03/20 USDC Colorado Page 106 of
Case 2:20-at-00395 Document 1-2 Filed 04/21/20 Page 6 of 7

your destination what pass you currently hold, aboard the next available Frontier flight at no
additional charge. Alternatively, if your flight is cancelled we'll provide you, upon
request, a full refund of any unused portion of your ticket.

- **Uncontrollable Situations** are defined as flight delays, diversions, or
  cancellations out of Frontier's control (such as those caused by weather, Air
  Traffic Control, aircraft damage caused by occurrences out of Frontier's control,
  such as bird strikes, etc.).  We truly regret that uncontrollable situations may
  interrupt your travel. Given their nature, we do not offer compensation for
  uncontrollable events beyond the re-accommodation on the next available
  Frontier flight. Alternatively, if your flight is cancelled we'll provide you, upon
  request, a full refund of any unused portion of your ticket.

In the event of severe weather, we will enact our Severe Weather Plan and issue travel
advisories on FlyFrontier.com. The Severe Weather Plan allows for re-booking of
flights without additional fees for a later date when the weather improves.

**FRONTIER**

Case No. 1:20-cv-01153-PAB-KLM Document 1-1 Filed 06/26/20 USDC Colorado Page 109 of 125

Case 2:20-at-00395 Document 1-2 Filed 04/21/20 Page 7 of 7



TAKE TO THE AIR

LIMITED TIME OFFER

Earn 50,000 bonus miles

APPLY NOW

## GET TO KNOW US

About Us

Careers

Newsroom

Destinations

Travel Agents

Groups

Inflight Menu

Blog

## NEED HELP?

Accessibility

Tips and FAQs

Contact Us

Optional Services

New Bag Prices

Legal

Privacy Policy

California Privacy Policy

CONNECT WITH US

 Email Signup

 Facebook

 Twitter

 Instagram

Copyright © 2020 Frontier Airlines    |    All Rights Reserved

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

SHIRLEY JOHNSON, on behalf of herself and all
others similarly situated,

        Plaintiff,

v.

FRONTIER AIRLINES, a Colorado corporation,

        Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

## I.     **INTRODUCTION**

1.     Plaintiff Shirley Johnson ("Ms. Johnson" or "Plaintiff") purchased a round-trip ticket on Frontier Airlines, Inc. ("Defendant" or "Frontier"). After the COVID-19 pandemic began, Frontier cancelled Plaintiff's flight. Under Frontier's Contract of Carriage, Ms. Johnson had the contractual right to a refund. But instead of honoring this contractual right, Frontier issued Ms. Johnson a voucher for future travel and refuses to refund Ms. Johnson the amount she paid for her ticket. Ms. Johnson sues for Frontier to honor its contract and provide a refund for herself and all others similarly situated.

2.     The COVID-19 pandemic has caused a sharp decline in demand for air travel. Many airlines—including Frontier—have cancelled previously booked flights to reduce supply in conformity with the reduced demand.

3.     Frontier's contract of carriage ("Contract of Carriage") unambiguously provides that if Frontier cancels a flight, it shall "provide a refund for the unused portion of the passenger's ticket."

4.     This requirement is also established by federal law. According to an enforcement notice issued by the United States Department of Transportation ("DOT") on April 3, 2020, carriers like Frontier have a "longstanding obligation . . . to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier." This refund obligation, DOT clarified, applies regardless of whether the cancellation arises from circumstances beyond the carrier's control: "[t]he focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger."

5.     Instead of fulfilling its obligations under federal law and honoring its passengers' contractual rights, Frontier has engaged in a pattern and practice of denying refund payments to its passengers for flights cancelled as a result of the COVID-19 pandemic. Frontier has refused to provide refunds, instead offering a voucher for future travel on Frontier that must be exercised within 90 days of a flight's cancellation—a condition that strips the "voucher" of value given current restrictions on travel, social distancing guidelines, and other uncertainties that preclude using the voucher in a timely manner.

6.     During a time of crisis and economic uncertainty, Frontier's practice of denying refunds has deprived Ms. Johnson and other consumers of money they paid for travel. Frontier's failure to provide refunds breached the terms of its Contract of Carriage, and Ms. Johnson accordingly sues to obtain the refunds to which she and the other Class members are entitled.

## II.    PARTIES

### a.    Plaintiff

7.      Plaintiff Shirley Johnson is a New Jersey citizen residing in Willingboro, New Jersey.

8.      On February 27, 2020, Ms. Johnson purchased an airline ticket from Frontier for $797.83. She purchased airfare for a round-trip flight from Philadelphia, Pennsylvania to Orlando, Florida departing April 18, 2020 and returning April 25, 2020. Ms. Johnson bought her tickets from Frontier online.

9.      On April 8, 2020, Ms. Johnson received an email from Frontier notifying her of her flight's cancellation.

10.     Frontier offered to issue Ms. Johnson a travel credit that purportedly would expire within 90 days.

11.     Ms. Johnson requested that her credit be converted to a refund. Frontier did not, however, provide her a refund. Ms. Johnson merely received an email from Frontier's CEO on May 6, 2020 informing her of the COVID precautions Frontier is taking.

12.     Ms. Johnson seeks the refund to which she is contractually entitled.

### b.    Defendant

13.     Frontier is a Colorado corporation with its principal place of business in Denver, Colorado.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class

3

members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest,

attorneys' fees, and costs; and (3) Plaintiff and Defendant are domiciled in different states.

15.      This Court has personal jurisdiction over Frontier because it has sufficient

minimum contacts in Colorado to render the exercise of jurisdiction by this Court fair and

proper. Frontier intentionally avails itself of markets within Colorado through its promotion,

distribution, and sale of transportation services in this State.

16.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Frontier's principal

place of business is located within the District of Colorado and because a substantial part of the

events or omissions giving rise to the claims occurred in this District.

## II.      **SUBSTANTIVE FACTS**

### A.      **Frontier's Contract of Carriage**

17.      According to Frontier, when a customer pays airfare for a Frontier flight, the

customer is subject to Frontier's Contract of Carriage.

18.      Under both its May 2019 (Version 70) and May 2020 (Version 74) Contracts of

Carriage, and at all other relevant times, Frontier's Contract of Carriage "appl[ied] to all tickets

issued for travel on flights operated by or for Frontier Airlines, Inc. ('Frontier') as well as that

transportation regardless of whether such ticket was sold by Frontier or its authorized agents or

whether such ticket is used ('Contract of Carriage')."

19.      Section 18 of Frontier's Contract of Carriage concerns specific remedies for flight

cancellation, providing:

> Delay, Misconnection, or Cancellation – In the event (i) a passenger's
> flight is canceled, . . . to the extent possible, Frontier will provide
> transportation on its own flights at no additional charge to the
> passenger's original destination or equivalent destination as provided
> herein. Frontier will have no obligation to provide transportation on
> another carrier. If Frontier cannot provide the foregoing transportation,

4

> Frontier **shall, if requested, provide a refund** for the unused portion of
> the passenger's ticket in lieu of the transportation under the foregoing.

20.    Section 18 of the Contract of Carriage likewise states that in the event of force majeure, "Frontier may cancel, divert, or delay any flight without liability *except to provide a refund for the unused purchase of the ticket.*"

21.    Under Section 20 of the Contract of Carriage, where the ticket is not used, "the refund amount will be equal to the fare" and other charges paid for the ticket. The refund, furthermore, "will be provided only to the original purchaser's form of payment."

22.    The Contract of Carriage also confirms that all refunds "will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made."

23.    Under these terms, if Frontier cancels a flight, it is contractually obligated to provide to each affected passenger the option to receive a full refund of the fare for the ticket.

24.    The Contract of Carriage does not authorize providing vouchers to customers when Frontier has cancelled a flight.

**B.    The COVID-19 Pandemic**

25.    In late 2019, the Chinese government confirmed several cases of a novel illness causing pneumonia-like symptoms. The illness was subsequently identified as COVID-19 (also known as the "Coronavirus" or "SARS-CoV-2"). By January 2020, the U.S. government confirmed several domestic cases.

26.    COVID-19 spread rapidly through the world in the first quarter of 2020. Millions have now been infected. The World Health Organization characterized COVID-19 as a "public

5

health emergency of international concern" in late January and as a pandemic on March 11, 2020.[1]

27.     Because the virus that causes COVID-19 is highly infectious, and because the illness can be severe or fatal, federal, state, and local governments in the United States have implemented travel restrictions and shelter-in-place or stay-at-home orders. New Jersey's stay-at-home order took effect on March 21, 2020.[2] As of the filing of this Complaint, the vast majority of states have ordered their citizens to shelter in place for protection of their personal health and safety and that of the broader public.

28.     The crisis, travel restrictions, and fear of contracting or spreading the disease have caused a sharp drop in demand for air travel. In April 2020, Frontier cut 90% of its flight capacity nationally.[3]

**C.     The Federal Regulations and DOT Notice**

29.     Frontier's failure to provide refunds breaches its contract with its passengers, as alleged herein, and also violates applicable federal regulations. Specifically, 49 U.S.C. § 41712 prohibits unfair or deceptive practices in the air carrier industry, and "since at least the time of an Industry Letter of July 15, 1996 . . . the [DOT's] Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is cancelled and the passenger wishes to cancel is a violation" of section 41712. Enhancing Airline Passenger Protections, 76 Fed. Reg. 23110-01, 23129.

---

[1] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited June 14, 2020).

[2] https://www.wired.com/story/whats-shelter-place-order-whos-affected/ (last visited Jun 14, 2020).

[3] https://www.cleveland.com/business/2020/04/frontier-airlines-cuts-90-of-capacity-flying-only-to-orlando-from-cleveland-hopkins-in-april.html (last visited June 14, 2020).

30.     As airlines like Frontier began to cancel flights *en masse*, DOT on April 3, 2020 issued an "Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel."[4] This DOT notice advises, in relevant part, "U.S. and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats, that passengers should be refunded promptly when their scheduled flights are cancelled or significantly delayed." The DOT notice further states: "Airlines have long provided such refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had an unprecedented impact on air travel, the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged."

31.     The DOT issued its notice due to its receipt of an increasing number of customer complaints from passengers like Ms. Johnson who reported being denied refunds. The notice thus makes clear that:

> Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.

---

[4]https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020.pdf. (last visited June 14, 2020).

### D. In Breach of Its Contractual Obligations, Frontier Has Denied Consumers Refunds During the Pandemic

32.     During the COVID-19 crisis, Frontier has cancelled a high volume of flights. While exact numbers are in the exclusive possession of Frontier, in late March, airlines were canceling over one-third of all scheduled flights each day in the United States.

33.     Because of the number of flights cancelled, Frontier had substantial financial incentives to prevent passengers from obtaining the refunds to which they were contractually entitled.

34.     To limit the number of refunds Frontier would be required to issue, starting in March 2020, Frontier engaged in a pattern and practice of denying refunds, and instead foisting vouchers on its customers. Worse, Frontier unilaterally imposed as a condition that the vouchers had to be used within 90 days, even with the shelter-in-place orders. Frontier's condition is simply unworkable because the unprecedented pandemic has neutralized travel and made it impossible for most people to make concrete travel plans.

35.     As reported on the travel website *One Mile at a Time*, "Frontier Airlines has by far the worst rebooking policy . . . Frontier Airlines is requiring customers to rebook future travel within 90 days of cancellation, and travel has to be completed by November 9, 2020.  Giving customers just 90 days to rebook is rather ridiculous when you consider the amount of uncertainty at the moment."[5]

---

[5] https://onemileatatime.com/frontier-airlines-convert-vouchers-into-miles/#:~:text=Frontier%20Airlines'%20awful%2090%20day%20rebooking%20policy,-Frontier%20Airlines%20has&text=Frontier%20Airlines%20is%20requiring%20customers,of%20uncertainty%20at%20the%20moment (last visited June 14, 20200.

36.     The internet is replete with complaints from consumers like Ms. Johnson who were denied refunds by Frontier during the COVID-19 pandemic.  Below is a small sample of the many complaints submitted to the Better Business Bureau:[6]

- I applied to Frontier Airlines for a full refund as my flight was canceled due to COVID-19. The airlines will only offer a credit that I do not want, they will not refund what I paid for my ticket.

- On April 30th I received an email stating that my flight to Miami from Boston in June had been cancelled by Frontier Airlines. The email stated that I had to follow a link to get a refund. After I pressed except it stated that I would receive a refund in 7 days. . . . On may 9th I called frontier regarding my refund that I still did not receive. They stated that I would only get a ticket credit versus a refund.

- I was supposed to receive a refund . . . . I called again today 5/17/20 after waiting an entire month for this refund to come to my card and a representative then told me that now i am not getting a refund and instead attempted to tell me i would receive flight vouchers. I DO NOT want or need flight vouchers . . . . I was promised by 2 previous representatives that my refund would be $144.60 and would be returned to my original payment method within 7 business days.

- I purchased a round trip plane ticket, with baggage, through frontier airlines for April 20, 2020 - April 29, 2020. Prior to the dates that flights were canceled by frontier. I was sent an email stating that since frontier canceled my flights that I would be eligible for a refund or a credit if I so choose. Since I am in healthcare and work directly with + confirmed COVID 19 patients I don't think it's best for me to be flying anytime soon so of course a refund is more appropriate. I have been in contact with frontier via phone x3 (4/6/2020, 4/24/2020, 5/14/2020). On the 1st two phone conversations I was reassured that I was in fact eligible for a refund and sent confirmation emails. Having not received my refund I reached out to them again yesterday and spoke with 3 different people regarding my refund. Now I'm being told that I am not eligible for a refund due to me "accepting the canceled flights". I explained that yes I responded to their email stating I understood the flights were canceled. I however have told them multiple times I want a refund. I was told yesterday that I can use my credit for the next 90 days and that "hopefully a vaccine will be available soon".

37.     Frontier's tactics saved it money but also provoked outrage. On March 31, 2020, a group of Senators, including Edward J. Markey, Richard Blumenthal, Elizabeth Warren, and

---

[6] https://www.bbb.org/us/co/denver/profile/airlines/frontier-airlines-inc-0885-55000095/complaints

Sheldon Whitehouse, sent a letter to Frontier CEO Barry L. Biffle urging the airline to "issue full cash refunds to all customers" whose flights are cancelled during the crisis.[7]

38.　　The Senators noted the toll the crisis has taken on personal finances: "The ongoing pandemic is placing enormous financial strain on millions of Americans, and families need cash to pay for essentials such as food housing, and medical care." The Senators further criticized Frontier's conduct as particularly inequitable given that the government bailed out the airline industry: "In light of this pressing need and the unprecedented bailout—to the tune of $25 billion—that the airline industry has just received from Congress,[8] we believe your company has a moral responsibility to provide real refunds, not travel vouchers, to consumers . . . ."

39.　　Despite its contractual obligations and the requirements imposed on it by the DOT and 49 U.S.C. § 41712, Frontier has deprived Plaintiffs and the Class of the refunds to which they are entitled by (1) failing to provide refunds to their credit or debit cards consistent with the terms of its Contract of Carriage; (2) issuing coupons or vouchers in place of refunds; and/or (3) impeding the ability of passengers to exercise their right to a monetary refund.

## III.　CLASS ALLEGATIONS

40.　　Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) as a representative of a class seeking damages and injunctive relief defined as follows:

> All persons or entities in the United States who purchased at least one ticket for a Frontier flight that was cancelled between January 1, 2020, and the present and who did not receive a refund (the "Class").

---

[7] https://www.markey.senate.gov/imo/media/doc/Airline%20Cash%20Refunds%20for%20Coronavirus%20Cancellations.pdf (last visited June 14, 2020).

[8] Coronavirus Aid, Relief, and Economic Security (CARES) Act, § 4003(b)(1), Pub. L. No. 116-136, https://www.congress.gov/bill/116th-congress/house-bill/748/text.

41.     The following persons and entities are excluded from the Class: Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; and the judicial officers and their immediate family members and associated court staff assigned to this case. Plaintiff reserves the right to modify the class definition based upon discovery and further investigation and/or to add appropriate subclasses.

42.     The members of the Class are so numerous that joinder is impracticable. The Class includes at least thousands of members. Frontier sells millions of tickets every year, and the recent cancellation of Frontier flights affected thousands of U.S. travelers. These individuals are widely dispersed throughout the country.

43.     Plaintiff's claims are typical of the claims of all Class members. Plaintiff's claims arise out of a common course of conduct that gives rise to the claims of all other Class members. Plaintiff and all Class members were and will continue to be damaged by the same wrongful conduct, *i.e.*, they were not able to obtain refunds from Frontier to which they are contractually entitled for cancelled flights.

44.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

45.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with consumer class action litigation.

46.     Questions of law and fact common to the Class include:

    a.  Whether Frontier's customers had a contractual right to refunds for flights cancelled by Frontier;

    b.  Whether Frontier breached its contract with customers when it did not provide refunds for flights that Frontier cancelled;

11

c. Whether Frontier breached its contract with customers by failing to provide an adequate means for customers entitled to receive refunds for flights that Frontier cancelled to request or otherwise obtain such refunds;

d. Whether Frontier breached its contract by providing Class members with vouchers instead of refunds;

e. Whether Frontier's conduct breaches its contracts with Class members;

f. The appropriate injunctive relief; and

g. The quantum of damages to which the Class is entitled.

47. Questions of law and fact common to the Class members predominate over any questions that may affect only individual Class members, because Frontier has acted on grounds generally applicable to the entire Class.

48. Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

49. Class treatment also is appropriate under Rule 23(b)(2) because Frontier has acted and refused to act on grounds that apply generally to the Class such that final injunctive relief and/or declaratory relief is warranted with respect to the Class as a whole.

## IV.  CLAIM FOR BREACH OF CONTRACT

50. Plaintiff restates and re-alleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein.

51.     Defendant made an offer to Plaintiff and members of the Class to enter into a contract for one or more airplane flights through passenger tickets for air travel between specific locations, on specific flight numbers, on specific dates and times, at specific prices.

52.     Defendant's offer included a promise that Defendant would refund fares and any carrier-imposed charges and surcharges, and taxes, fees and charges that Plaintiff and Class members have paid if Defendant cancelled the flights purchased. This promise was specifically made in Defendant's materially uniform Contract of Carriage.

53.     Defendant made such offers in writing through its direct channels (such as its website) and through traditional travel agencies and online travel agencies.

54.     The terms of Defendant's offer contained an express, definite promise by Defendant and gave Plaintiff and members of the Class the power to agree to the terms of Defendant's offer through the act of purchasing a ticket or accepting transportation on Defendant's aircraft.

55.     Plaintiff and members of the Class accepted Defendant's offer, agreeing to the terms contained in Defendant's offer, including the Contract of Carriage. Plaintiff and members of the Class communicated their acceptance of Defendant's offer by purchasing one or more plane tickets.

56.     Plaintiff and members of the Class provided valuable consideration, namely the monetary value of the fare and all charges and taxes paid.

57.     Plaintiff and members of the Class performed all obligations and conditions required and expected of them under their contract with Defendant.

58.     Defendant cancelled flights for which Plaintiff and members of the Class had tickets.

59.     Defendant failed to provide refunds to Plaintiff and members of the Class, as it was contractually obligated to do. Instead of offering refunds, Defendant acted to prevent Plaintiff and members of the Class from requesting refunds, and in lieu of providing refunds, offered them vouchers for future travel.

60.     As a result, Defendant failed to perform and materially breached its express obligations under its contract with Plaintiff and members of the Class.

61.     Because of Defendant's failure to perform the contract, Plaintiff and members of the Class have been damaged and/or did not receive the benefits, payment, and/or performance to which they were entitled.

62.     As a result, Plaintiff and members of the Class are entitled to complete refunds for all fares, charges, and taxes paid, in an amount to be proven at trial.

## V.    RELIEF REQUESTED

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully demands that the Court:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), and (b)(3), direct that notice of this action be given to the Class pursuant to Rule 23(c)(2), and appoint Plaintiff as a named representative of the Class;

B.     Permit expedited discovery proceedings leading to a prompt trial on the merits before a jury;

C.     Enter judgment against Defendant and in favor of Plaintiff and the Class;

D.     Award damages and refunds in the amount of unrefunded monies paid for Frontier airline tickets, in addition to statutory damages, punitive or exemplary damages, and pre-judgment and post-judgment interest, and such other relief as permitted by law;

E. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

F. Enter injunctive relief to stop Defendant's unlawful conduct; and

G. Award such further and additional relief as is necessary to correct for harms Defendant's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## VI.   **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: June 15, 2020

**BERGER MONTAGUE PC**

/s/ *Shanon J. Carson*
Shanon J. Carson
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-4656
Email: scarson@bm.net

**BERGER MONTAGUE PC**
John G. Albanese
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470
Email: jalbanese@bm.net

**GIRARD SHARP LLP**
Adam E. Polk
Jordan Elias
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
Email: apolk@girardsharp.com
Email: jelias@girardsharp.com

*Attorneys for Plaintiff*

15